UNITED STATES of America for the Use and Benefit of PEROSI ELECTRICAL CORPORATION, Plaintiff,

v.

MANSHUL CONSTRUCTION CORP., et al., Defendants.

No. 94 CV 1575 (RML).

United States District Court, E.D. New York.

Aug. 2, 1996.

Goldberg & Connelly by Peter L. Agovino, Joseph P. Asselta, Rockville Centre, NY, for plaintiff Perosi Electrical Corp.

Sheldon Feinstein, P.C. by Sheldon Feinstein, Bayside, NY, for defendant Manshul Construction Corp.

### MEMORANDUM AND ORDER

LEVY, United States Magistrate Judge:

This action arises out of a renovation and improvement project for the Community Facilities Building at the United States Naval Station in Staten Island, New York. (the "Project"). Defendant Manshul Construction Corp. ("Manshul") was the general contractor on the Project. Manshul hired plaintiff Perosi Electrical Corp. ("plaintiff" or "Perosi") as an electrical subcontractor. In this action, brought pursuant to the Miller Act, 40 U.S.C. §§ 270a and 270b, Perosi is seeking to recover from Manshul and its surety, defendant Aetna Casualty and Surety Company ("Aetna"), payments it claims it is owed for work performed and materials furnished in connection with the Project. Manshul is counterclaiming for damages it allegedly incurred in order to correct or complete work Perosi was under contract to perform.

By stipulation dated February 20, 1996, the parties consented to a trial before a Magistrate Judge. Accordingly, a bench trial was held before me on March 20 and 21, 1996, at which three witnesses testified: Richard Perosi, an officer of the plaintiff corporation; Alfred Haugland, Project Manager for the defendant corporation; and George Oprescu, Senior Project Manager for the Maximum Electric Company, an electrical subcontractor that also contracted to perform work for the Project. For the reasons stated below, I find in favor of plaintiff Perosi, in the total amount of $83,713.33, plus interest.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

On or about September 26, 1991, the United States entered into a written contract with Manshul, whereby Manshul agreed to furnish the necessary labor and

materials for the renovation and improvement of the Headquarters/Administration, Community Facilities Building at the Naval Station in Staten Island. On the same date, in accordance with 40 U.S.C. § 270a, Manshul and Aetna, as surety, executed and delivered to the United States a payment bond in the penal sum of $2,500,000, wherein Manshul and Aetna bound themselves jointly and severally to all persons furnishing labor or materials in connection with the Project. Manshul then entered into an Electrical Subcontract Agreement with Perosi, dated January 6, 1992, wherein Perosi agreed to supply all labor, materials and equipment necessary to complete the electrical work for the Project.[1] In consideration therefor, Manshul agreed to pay Perosi the sum of $835,000.

On January 17, 1992, Perosi commenced performance of its obligations under the Electrical Subcontract Agreement. It is undisputed that, to date, Manshul has paid $720,245 to or on behalf of Perosi under that agreement. (*See* Amended Civil Pretrial Order at ¶ 5).[2]

*Perosi's Claims*

Perosi contends that it duly completed and performed all of its obligations under the Electrical Subcontract Agreement, except as prevented or frustrated by Manshul's "material breaches"; it thus seeks to recover the remainder of the balance due under that agreement, in the sum of $114,755, together with interest from February 17, 1994. (*See* First Amended Complaint at ¶ 11). Perosi also seeks to recover for additional and extra work, not included in the Electrical Subcontract Agreement, that it claims Manshul directed it to perform and for which it claims it has not received payment. According to Perosi, such work includes: (a) furnishing control wiring for VAV boxes for the temperature control equipment; (b) remedying defective sheetrock cuts; (c) providing and maintaining temporary light and power to perform "miscellaneous site work" ordered by Manshul; (d) repairing ducts damaged by others; and (e) wiring a radio transmitter in the Administration Building. Perosi alleges that the fair and reasonable value of this extra work was $53,849.43; it thus seeks recovery of that amount, together with interest from February 17, 1994. Each of plaintiff's claims will be addressed in turn.

*The Electrical Subcontract Agreement*

The Electrical Subcontract Agreement, dated January 6, 1993, required Perosi to "supply all labor, materials and equipment necessary to complete all Electrical Work, as called for by the contract specifications and amendments and as shown on the contract drawings." Such work was to include, but was not limited to: (a) demolition and removal work, (b) electrical general requirements, (c) the underfloor raceway system, (d) overhead electrical work, (e) interior wiring systems, (f) interior switchboard, low-voltage, (g) pad mounted transformer (750 KVA), (h) interior lighting, (i) exterior lighting; and (j) the fire alarm and fire detecting system, all as described in the contract specifications and amendments. In addition, the agreement required Perosi to, *inter alia,* (1) furnish to the jobsite all extension cords as required, (2) provide all ground fault detectors as required, (3) provide all temporary light and power systems "for all days that work of the General Contractors trades shall be at the jobsite," (4) provide temporary site lighting as per the contract plans, specifications and amendments, (5) perform all site electrical work, including site lighting and all underground work, (6) furnish and install all new telephone ducts per the plans and specifications, (7) remove existing overhead electric lines, poles and transformers, as per the plans, specifications and amendments, (8) provide electrical lighting and power for the general contractor, (9) place all rubbish and debris into containers, for removal by others,

---

1. Rider "A" to the Electrical Subcontract Agreement states: "Any lawsuit or legal proceeding arising out of or pertaining to this Agreement must be brought in a Court of competent jurisdiction located in either New York County or Queens County, New York." The parties are deemed to have waived this provision.

2. Included in this amount is $15,515 paid by Manshul to Hallmark Electrical Sales Co. ("Hallmark"), an electrical supplier, in full payment and satisfaction of Hallmark's claims for materials supplied to Perosi in connection with the Project.

(10) coordinate with other trades and provide coordination drawings, (11) provide all shop drawings, certificates as required by the Navy, test reports, catalogs and cuts, (12) perform all testing and provide all reports required for the Project, (13) furnish and install all underground work as per the plans, specifications and amendments, (14) provide all access doors related to its work, (15) furnish and install all electrical cells as shown on electrical drawing S–1, (16) furnish and install header trenches and covers, (17) furnish and install concrete bases for light poles, (18) provide all safety features including safety nets, goggles, signs, etc., and (19) furnish and install all sleeves required to be installed in foundation walls.

Specifically excluded from the agreement were, *inter alia*, "control wiring," unless "shown on the electrical drawings under requirements of the electrical specifications," and "H.V.A.C. Control Wiring," defined by Richard Perosi at trial as "[a]ny control wiring that has to do with the heating, ventilating and air-conditioning system. . . ." (Trial Transcript ("Tr.") at 14).

In addition, Paragraph 9 of the agreement, as amended, states in pertinent part:

> Total payment to the Subcontractor for work performed hereunder shall be the total sum of $835,000 which sum shall be payable as follows: Payments to be made as work progresses and within ten (10) days of receipt of payment by General Contractor from the Owner, less ten percent (10%) retainage. Retainage to be paid within ten (10) days of receipt of payment of same by the General Contractor from the Owner.

According to Richard Perosi's trial testimony, it was plaintiff's practice to submit requisition forms, or bills, to Manshul on a monthly basis, in order to receive payment for the work performed in the preceding thirty-day period. (Tr. at 18–19). Perosi submitted a total of twenty-four such requisition forms to Manshul in connection with work it performed for the Project. (Tr. at 19) Richard Perosi stated that, in order to determine the dollar amount of each requisition, Perosi's project supervisor, Al Santiago, would meet with a representative of Manshul

and agree on a "percentage complete," which would be communicated back to Richard Perosi's office for submission. (Tr. at 23–24). It was Richard Perosi's understanding that Manshul was then expected to pay Perosi the amount billed, minus a "retainage," typically ten percent, which Richard Perosi described as an amount "that the general contractor holds to make sure the job gets completed." (Tr. at 25). Nevertheless, Mr. Perosi did not explain how he reached that understanding or describe any communications with Manshul in which such an arrangement was discussed. Nor did he personally witness any conversations or meetings in which Mr. Santiago and a representative of Manshul discussed or agreed on a "percentage complete."

According to a payment summary sheet prepared by plaintiff and admitted in evidence as Exhibit 42, Perosi submitted requisitions totaling $835,000 and received payments totaling $704,730. Perosi thus claims that Manshul owes it $109,395 for work performed pursuant to the agreement, plus $20,875 in retainage, for a total of $130,270. Taking into account the $15,515 paid by Manshul directly to Hallmark Electric, in settlement of claims made by Hallmark Electric against Perosi for labor and materials provided in connection with the Project, Perosi's actual claim is for $114,755, plus claims for "extra" work, discussed in more detail below.

Despite his statements concerning the alleged agreement between Perosi and Manshul regarding billing for work performed pursuant to the contract, Richard Perosi testified that Manshul often paid plaintiff less than the amount billed on the requisition form, so "the payments never matched or corresponded to the requisitions." (Tr. at 25–26). Indeed, on at least four occasions Manshul paid Perosi amounts ranging from $10,000 to $36,000 without having received a requisition for work performed.

Contrary to Mr. Perosi's description of the requisition process, Alfred Haugland testified that the procedure was as follows:

> [Perosi's] project manager would send a certain percentage completion in a formal requisition to [Manshul's] project manager

... around the end of the month, usually around the 25th of the month. [Then, Manshul's project manager] would call me [and] say "Al, you establish[ ] the amount of work which Perosi has done this month because I'm expecting a requisition and then we'll review, I need the percentages from you." So, I would give [my project manager] the percentage which I thought was fair.... Then he would submit that requisition to the Navy. At some time [if] the Navy thought the percentages were too high, they would cut the requisition. (Tr. at 166). Thus, Mr. Haugland testified that it was common for subcontractors, including Perosi, to be paid less than the amount of their requisitions, depending on Manshul's and the Navy's determinations concerning the percentage complete. (Tr. at 167).

More significantly, however, Mr. Perosi admitted on cross-examination that he only visited the job site "once every couple of weeks ... [u]sually for about an hour." (Tr. at 61). Thus, he did not supervise his employees on a daily, or even a weekly, basis. Mr. Perosi further testified that his company did not maintain time sheets or payroll records for regular contract work related to the Project. (Tr. at 62, 76) Accordingly, Mr. Perosi has no direct, personal knowledge of what work was performed, by whom and when, and maintained no documentation to show what work his company completed. Of course, plaintiff bears the burden of proving its claims by a preponderance of the evidence. Richard Perosi's bare, unsubstantiated assertion that his company performed all of the work required under the Electrical Subcontract Agreement, without more, is insufficient to satisfy that burden.

Notwithstanding plaintiff's failure to produce testimony from witnesses with personal knowledge, or some other documentation to support its assertion that it complied with all of its obligations under the contract, defendant concedes that Perosi is entitled to the full contract price minus backcharges for the work it failed adequately to perform or complete. (*See* Defendants' Post–Trial Brief at 15). Accordingly, each of Manshul's claimed backcharges will be addressed in turn.

*"Punch List" Work*

Among the tasks plaintiff was required to perform under the Electrical Subcontract Agreement were items contained on various "punch lists." In his trial testimony, Richard Perosi described "punch list" work as follows:

[A]fter an inspector visits the site and inspects all the work, he'll come up with work that is not to his liking or to the specs and he'll put on a list and the list has to be taken care of by whoever's responsibility it is.

(Tr. at 31). Thus, a punch list is a list of corrective work to be completed. (Tr. at 68) Mr. Perosi testified that at some point, Manshul presented him with a punch list and the plaintiff company performed the work included on that list. (Tr. at 31, 67–68). A letter from Al Santiago, Project Manager for Perosi, to Lawrence Horowitz, Project Manager for Manshul, dated March 3, 1994, purports to confirm that Perosi completed at least some of that work. The letter, which was received in evidence as Exhibit 73, states in relevant part:

The electrical contract work on this project has been on a "Beneficial Occupancy Status" going back prior to February 7, 1994. This includes completing preliminary punch list work, dated 1/28/94 for the Third Floor, 2/1/94 for the Second Floor and 2/14/93 for the First Floor, generated by your C.Q.C. representatives.

The exceptions to the above are approximately 11 light fixtures that are being replaced for defective reasons and minor miscellaneous items.

\*     \*     \*     \*     \*     \*

We received subsequent punch list letters, dated 2/8/94, 2/18/94 and 2/23/94, which we are reviewing for compliance or other action. Our response will be forthcoming.

However, this letter refers only to "preliminary punch list work," described by Richard Perosi as "the punch list before the primary punch list." (Tr. at 69) It does not purport to confirm that plaintiff completed the items on the final punch list. Moreover, Mr. Perosi admitted that his company did not repair or replace the eleven light fixtures to which

the letter refers, although it was required to furnish such fixtures under the contract. (Tr. at 70–71).

More importantly, Mr. Perosi admitted on cross-examination that he was not present on the job site when punch list work was performed, and did not personally check to see if his employees completed all of the items on the various punch list letters. (Tr. at 68) Other than Mr. Perosi's bare assertion that his company completed all of the punch list items, plaintiff introduced no testimony from witnesses with direct knowledge and no documentation or other evidence to support this claim. Indeed, plaintiff did not introduce into evidence the punch lists dated 2/8/94, 2/18/94 and 2/23/94, described in Exhibit 73, or a "final" punch list; thus, the court has no way of determining what work those lists required, let alone whether plaintiff completed such work.[3]

Indeed, contrary to Mr. Perosi's assertions that his company completed all of the punch list items, Alfred Haugland testified that Perosi never completed its punch list work. (Tr. at 168) To support this claim, defendant introduced as Exhibit 77 a letter dated March 1, 1994 from Manshul to Perosi, which states:

Receipt is acknowledged of your letter wherein you state that $130,000 is due. At this point Perosi is endangering its payment by failing or refusing to complete its work. In fact, this project is now subject to liquidated damages which, in part, are due to Perosi's failure to perform. In this regard we refer you to your earlier commitments to complete given to our office on November 24th, 1993 and December 13, 1994. Neither of these commitments were kept.

We further refer you to our earlier correspondence advising of the lack of adequate manpower to complete your work. We also refer you to our earlier correspondence to your office of January 5, 1994 where we stated that the owner will not accept the building without proper operation and maintenance manuals. At the meeting at our office on February 5, 1994, Perosi's Mr. Santiago stated that he had all manuals and that he was withholding them for his own ends and purposes. This is unacceptable. Until the manuals are provided and punch list work completed, no further payments will be made and liquidated damages will be charged to the Perosi subcontract.

We urge you to return to the job and complete your outstanding obligations without further delay. Unless progress is made on the punch list and manuals, we shall have no choice but to contact your bonding company and look to your surety to complete this project.

According to Mr. Haugland's trial testimony, Manshul hired a company called Maximum Electric to correct the punch list items that Perosi failed to remedy. (Tr. at 174) To substantiate that claim, defendant introduced as Exhibit 78 a bill from George Oprescu, Senior Project Manager for Maximum Electric, to Manshul dated June 6, 1994. The bill is entitled "PUNCH LIST WORK" and lists five specific punch list items, for a proposed price of $8,000. Manshul also introduced as Exhibit 79 a copy of a check from Manshul to Maximum Electric for $8,000, dated June 16, 1994.

The court credits Mr. Haugland's testimony on this point. Accordingly, Manshul is entitled to $8,000 in backcharges for "punch

---

**3.** Defendant introduced into evidence, as Exhibit 33, a punch list dated March 15, 1994. The first page of the document contains the statement: "This acknowledges completion of the following punch list items generated during final inspection." The punch list is forty-two pages long and lists hundreds of items that various sub-contractors were required to complete, including approximately 170 items that Perosi was to complete.

Despite the statement on the cover page acknowledging completion of these punch list items, Richard Perosi admitted that at the time

his company received the March 15, 1994 punch list it had not yet completed every item on the list. Specifically, he testified: "There were several items we didn't complete but by the time we got this punch list most of the items were completed already." (Tr. at 80). Moreover, the document does not contain a signature or any indication as to who prepared it. Accordingly, the court finds this document to have little probative value. By Mr. Perosi's own admission, the list does not accurately reflect the work his company had completed by that date.

list" work, plus overhead and profit,[4] for a total of $9,680.00.

### Failure to Furnish "As Built" Drawings

Manshul contends that Perosi failed to provide "as built" drawings, described by Richard Perosi at trial as "drawings to show any changes that took place during the job." (Tr. at 71) Richard Perosi conceded on cross-examination that the Electrical Subcontract Agreement required his company to provide such drawings and that it failed to do so. (Tr. at 72). In fact, defendant introduced into evidence as part of Exhibit 29 a letter dated June 3, 1994 from Allan G. Schulman, President of Manshul, to Vincent LaPenta, General Manager of Perosi, which states:

> You have refused to furnish and install certain light fixtures indicated on the punch list and to provide us with as-built drawings. Be advised that we shall perform this work and charge to your account all charges so incurred together with G.C. overhead and profit.

Additional letters from Manshul to Perosi, dated May 13, 1994, May 17, 1994, June 9, 1994, and June 13, 1994, all admitted as part of Exhibit 29, demand that Perosi furnish and install missing light fixtures and provide as-built drawings and warn that Perosi's failure to comply will result in backcharges to its account. When Perosi failed to complete this work, Manshul did so and then sent Perosi a bill for the cost it incurred. (Tr. at 176). Exhibit 32 is a bill for, among other things, preparation of the "as built" drawings. It charges Perosi $1,500 for the preparation of the drawings which, according to Mr. Haugland, constitutes the "fair and reasonable" value of the work. (Tr. at 176).

Mr. Perosi testified that his company was in the process of producing the "as built" drawings when Manshul "went out and did it themselves." (Tr. at 149). Nonetheless, the amount of correspondence sent by Manshul on this issue indicates that Perosi did not complete the drawings in a timely manner. Accordingly, Manshul is entitled to $1,500 in backcharges for the cost of producing the "as

built" drawings, plus overhead and profit, for a total of $1,815.00.

### Emergency Lighting

Mr. Haugland testified that there was an "internal problem" with the emergency lighting installed by Perosi. (Tr. at 180). He further testified that he spoke with Mr. LaPenta at Perosi concerning the problem and sent faxes to Perosi requesting that it remedy the problem. (Tr. at 180–81). When Perosi failed to correct the problem, Manshul hired Maximum Electric to do so (Tr. at 181) and paid it $457.38 for the work. (Tr. at 182) Manshul then billed Perosi $553.43 for the repairs to the emergency lighting, including overhead and profit.

Plaintiff made no effort to dispute any part of this claim, and the court credits Mr. Haugland's testimony on this point. Accordingly, defendant is entitled to a backcharge of $553.43 for the cost of repairing the faulty emergency lighting.

### Library Light Fixture

■ Manshul contends that, after Perosi finished repairing a light fixture in the library, the Department of the Navy reported that the fixture was operating "erratically" and demanded that it be corrected. (See Letter from D.A. Petno, Assistant Resident in Charge of Construction, to Manshul dated June 30, 1994; introduced as part of Exhibit 63). Correspondence from Manshul to Perosi indicates that Manshul hired Maximum Electric to perform the repairs, and paid it $756.00 for doing so. (See Exhibit 63) Manshul then billed Perosi $914.94 for the cost of hiring Maximum Electric to complete the repairs, plus profit and overhead. (Tr. at 188).

Mr. Perosi testified that the light fixture came with a manufacturer's warranty, and that his company contacted the manufacturer about the faulty light fixture and then told Manshul that it was waiting for a new ballast to arrive. (Tr. at 120–21). Mr. Perosi admitted that his company never went back to the site to repair the condition (Tr. at 121),

---

**4.** It is undisputed that it is customary in the industry for a general contractor to charge ten percent overhead and ten percent profit when it performs work on a subcontractor's behalf. (Tr. at 176–77).

but he testified that his company was in the process of attempting to obtain a replacement fixture from the manufacturer when Manshul "jumped the gun and went and did it." (Tr. at 148).

The only correspondence from Manshul to Perosi on this issue is a handwritten letter dated July 8, 1994 from Al Haugland to Vincent LaPenta, which states: "Attached find letter from the Navy regarding problems with Library lighting. We have assigned another electrical contractor to complete this work. We will bill your account for all costs incurred." (*See* Exhibit 66). Defendant produced no evidence to suggest that it gave Perosi notice of the problem or a reasonable opportunity to repair the condition. Accordingly, Manshul has failed to demonstrate that it is entitled to a backcharge for repairs to the library light fixture.

*Ceiling Support System Wiring*

■ Manshul argues that Perosi failed to install the necessary wires to support the fluorescent light fixtures in the drop ceiling.[5] It points to section 16510, paragraph 3.1 of the specifications, which requires Perosi to:

[s]et lighting fixtures plumb, square and level with ceiling and walls, in alignment with adjacent lighting fixtures, and secure in accordance with manufacturer's directions and approved drawings. The installation shall meet with the requirements of NFPA 70. Mounting heights specified or indicated shall be to bottom of fixture for ceiling-mounted fixtures and to center of fixture for wall-mounted fixtures. Obtain approval of the exact mounting for lighting fixtures on the job before installation is commenced and, where applicable, after coordinating with the type, style, and pattern of the ceiling before being installed. *Recessed and semirecessed fixtures may be supported from suspended ceiling support system ceiling tees if the ceiling system support wires are provided at a minimum of four wires per fixture and located not more than 6 inches from each corner of each fixture.* Additionally, for recessed fixtures, provide support clips securely fastened to ceiling grid members, a minimum of one at or near each corner of each fixture. . . . (emphasis supplied)

Richard Perosi admitted at trial that his company did not install the ceiling system support wires "at a minimum of four wires per fixture and located not more than 6 inches from each corner of each fixture," but he maintained that such wiring was "the ceiling man's responsibility." (Tr. at 123). According to his interpretation, this section does not require Perosi, or any specific subcontractor, to install the ceiling system support wires, but merely states that the light fixtures may be supported from ceiling tees if the support wires are already in place. (Tr. at 127).

Not surprisingly, Mr. Haugland's interpretation of this section differed from Mr. Perosi's. According to Mr. Haugland, this section required Perosi to install the support wires after putting in the light fixtures. (Tr. at 195). He further testified that Manshul sent Perosi two faxes, dated November 2, 1993 and November 22, 1993, requesting that Perosi return to install the ceiling support wires. (Tr. at 196–97; Exhibits 54 and 55). When Perosi refused to do so, Manshul did some of the work itself, and then hired Nastasi White, the ceiling subcontractor, to perform the remainder of the work. (Tr. at 198; 226; 231).

■ It is axiomatic that vague or ambiguous contract language must be construed against the drafter, in this case Manshul. *Wong v. Michael Kennedy, P.C.*, 853 F.Supp. 73, 80 (E.D.N.Y.1994) ("where a contract is ambiguous, it must be construed most strongly against the party who prepared it"); *Jacobson v. Sassower*, 66 N.Y.2d 991, 993, 489 N.E.2d 1283, 1284, 499 N.Y.S.2d 381, 382 (1985) ("In cases of doubt or ambiguity, a contract must be construed most strongly against the party who prepared it and favorably to a party who had no voice in the selection of its language"); *67 Wall St. Co. v. Franklin Nat'l Bank*, 37 N.Y.2d 245, 249, 333 N.E.2d 184, 187, 371 N.Y.S.2d 915, 918 (1975)

---

5. Mr. Haugland explained that a drop ceiling is "a ceiling suspended from the floor above ... [b]y wires," which are connected to a grid system of tees, on which the ceiling tiles and fluorescent light fixtures rest. (Tr. at 193–94).

(same); *Willis v. New York City Police Dep't,* 214 A.D.2d 428, 428, 625 N.Y.S.2d. 43, 44 (1st Dep't 1995) ("this case involves the interpretation of a contract, which in cases of doubt or ambiguity, should be construed against the drafter").

Here, the language of section 16510, paragraph 3.1 of the specifications, read alone, is vague and ambiguous; it does not state explicitly that it was Perosi's responsibility to install the ceiling system support wires, but simply provides, in passive language, that the fluorescent light fixtures "may be supported from suspended ceiling support system ceiling tees if the ceiling system support wires are provided."

However, as Manshul points out, section 16510, paragraph 2.12 is entitled "SUPPORT HANGERS FOR LIGHTING FIXTURES IN SUSPENDED CEILINGS." It specifies two different types of wiring to be used for supporting the light fixtures in the drop ceilings: "FS QQ–W–461, composition 1010, soft annealed, light zinc coated finish, 0.1055 inches in diameter," and, for humid spaces, "ASTM A580, composition 302 or 304, condition annealed stainless steel or FS QQ–N–281, Class A nickel-copper alloy, 0.1055 inches in diameter." These requirements appear in Division 16 of the specifications, which refer exclusively to the electrical subcontractor, in this case Perosi. (Tr. at 116) Clearly, that division would not specify the exact type of wiring to be used to support the suspended light fixtures if it were not the electrical subcontractor's responsibility to install such wiring.

At trial, Manshul provided adequate proof that it engaged one carpenter to perform this work for 28 hours at $52.64 per hour. (Tr. at 231–33; Exhibit 65). Adding in overhead and profit, Manshul's total cost for its work on the installation of support wires was $1,783.44. In addition, it paid Nastasi White $10,541.0. for its work installing wires. (Tr. at 198; 226) Thus, Manshul's total backcharges for this work totaled $12,755.22, including overhead and profit. Perosi did not dispute Manshul's claim concerning the cost of the installation. Since it was Perosi's responsibility to perform such work, Manshul is entitled to $12,755.22 in backcharges for

the cost of installing the ceiling support wires.

*Removal of Temporary Lights and Wires*

Mr. Haugland testified that it was Perosi's responsibility to remove all temporary lights and wiring at the end of the job, and that he personally asked Mr. Santiago on several occasions to do so. (Tr. at 189; 237) To support its claim that Manshul asked Perosi to remove the temporary lighting, defendant introduced, as Exhibit 64, a handwritten fax from Al Haugland to Al Santiago, dated December 1, 1993, which states in its entirety:

> We are installing entire ceiling tiles on 2nd floor. 2 weeks ago we mentioned that the Navy required the Temp lights to be removed. At that time you stated that it may not be a requirement.

Mr. Perosi testified that he did not recall ever seeing this fax. (Tr. at 135). Rather, he testified that he did not know whether Manshul instructed Perosi to remove the temporary lighting and wiring (Tr. at 135) or whether Perosi ever did so. (Tr. at 136).

Mr. Haugland testified that Manshul removed the temporary lights and wiring and billed Perosi $363.00 for the fair and reasonable value of some of that work. (Tr. at 190). In addition, Mr. Haugland testified that Manshul performed "[a]bout a hundred man hours" of work removing temporary wires as it "closed up the ceilings," at a total cost of $6,535.21, including overhead and profit. (Tr. at 243–44; Exhibit 68).

Plaintiff did not dispute the contention that it was required to remove the temporary lights and wires; nor did it dispute Manshul's claim concerning the cost involved in performing that work. Accordingly, Manshul is entitled to $6,898.21 in backcharges for the cost of removing temporary lights and electrical wires.

*Waste Removal*

As explained above, the Electrical Subcontract Agreement required Perosi to "place all rubbish and debris into containers, for removal by others." Manshul contends that, because Perosi failed to properly remove its debris from the job site, Manshul was forced to incur the costs of such waste removal.

Mr. Haugland testified that he sent a fax to Vincent LaPenta at Perosi, dated February 7, 1994 and admitted in evidence as part of Exhibit 70, which states: "When your men made the connection on the site poles they left the packing material at each pole. The Commander visited the site this afternoon @ 3:30 p.m. and instructed us to clean up immediately. . . . Please assign your men to police the adjacent properties at Tompkins Ave., etc." When Perosi failed to remove the debris, Manshul assigned some of its own employees to do so, at a cost of $699.79, including overhead and profit. (Tr. at 252–53; Exhibit 70).

Plaintiff did not contest any of defendant's allegations concerning the failure to remove debris; in fact, Mr. Perosi testified that he did not have any personal knowledge as to whether or not his company ever removed this debris. (Tr. at 137) Accordingly, Manshul is entitled to $699.79 in backcharges for the cost of removing debris left by Perosi's employees.

### Installation of Trailer Steps

Richard Perosi also conceded on cross-examination that Manshul paid to install stairs to Perosi's site trailer at Richard Perosi's request. (Tr. at 119). He testified that his company had agreed that Manshul would install the steps, keep a record of the cost and send Perosi a bill. (Tr. at 141). Mr. Perosi further admitted that Manshul sent him an invoice for that work "right away," and that his company did not remit payment. (Tr. at 141).

Defendant introduced as Exhibit 53 a bill from Manshul to Perosi, dated January 5, 1993, for the cost of building stairs to Perosi's trailer at the worksite. The total amount of the bill is $662.38. Given Mr. Perosi's admission that his company agreed to pay Manshul the cost of installing the steps, Manshul is entitled to $662.38 in backcharges for performing this work.

### Revision from 500 MCM Wire to 250 MCM Wire

Defendant introduced, as Exhibit 37, a document entitled "Amendment of Solicitation/Modification of Contract," dated May 14, 1993. The document was issued by the Department of the Navy to Manshul and reflects a revision in the electrical specifications for the main transformer, from 500 MCM electric cable to 250 MCM electric cable. Mr. Perosi testified that he recalled receiving a copy of the document, and that he recalled agreeing to give Manshul a credit of $4,800.00, which reflected a decrease in the cost of the electric cable. (Tr. at 139). Accordingly, Manshul is entitled to a backcharge of $4,800.00, plus overhead and profit, for a total of $5,808.00. (Tr. at 256).

### Malfunctioning Fire Alarms

Mr. Haugland testified that there were a number of problems with the fire alarm systems after Perosi installed them. Specifically, "[t]he alarms were going off at various times in three zones." (Tr. at 247). He testified that he sent a fax to Perosi, dated August 2, 1994 and admitted in evidence as part of Exhibit 71, which states: "We advise you that three lights are on in the Fire Alarm Cabinet with audio alarms—> (1) System Trouble (2) Signal Ground (3) City Trouble. You need to correct this *immediately*." (emphasis in original) When Perosi failed to correct the problems, Mr. Haugland sent a letter to Vincent LaPenta at Perosi, dated August 8, 1994 and admitted as part of Exhibit 71, which states:

> On August 2, 1994, we advised you of a letter from the Navy informing us of three malfunctioning alarms within the fire alarm cabinet. We request that you immediately make the necessary repairs and/or replacements to insure that the fire alarm is in good working order. If this is not accomplished within 72 hours, we will perform the work required . . . and charge your account for all costs as well as general contractors overhead and profit.

When Perosi continued to refuse to correct the problems with the fire alarms, Mr. Haugland sent a second letter on August 11, 1994, this time to the attention of Richard Perosi, which states:

> Subsequent to our letters of August 2, 1994 and August 8, 1994 pertaining to the three malfunctioning alarms within the main fire alarm panel, we have engaged a maintenance subcontractor to make all corrections outside the Simplex panel. This

subcontractor corrected the city alarm without entering the panel. However, he instructed us to notify Simplex [the manufacturer] to make corrections within the panel to the two other alarms—trouble system and ground system.

When we notified Simplex we were informed that their warranty period with Perosi started April 6, 1993 and ended April 6, 1994. No arrangement had been made by Perosi for service after April 6, 1994.

We have engaged Simplex to make all necessary repairs. All costs incurred from out maintenance subcontractor and Simplex will be charged to your account as well as General Contractors overhead and profit.

(Tr. at 250; Exhibit 71). Manshul subsequently sent Perosi a bill for the cost of the repairs, which totaled $326.70, including overhead and profit. (Tr. at 250–52; Exhibit 71).

Mr. Perosi recalled receiving letters from Manshul about malfunctioning alarms within the fire alarm cabinet. (Tr. at 139). He testified that his company did not repair any part of the fire alarm system, because it was a warranty item and thus was the manufacturer's responsibility. (Tr. at 140). However, plaintiff submitted no evidence to support this contention or the proposition that it was not responsible for repairing the fire alarms.

In addition, Mr. Haugland testified that there was a problem concerning the placement of seven fire alarm bells. According to his testimony, "Perosi's men put the fire alarm too high. They put the box for the fire alarm too high. So the distance between the top of the bell itself, the round bell, was too close to get the right vibrations from the bell. So what we had to do is cut the ceiling . . . and put a recess around the bell." (Tr. at 234). He explained that Manshul "asked Perosi to . . . drop it down to the right location and they refused to do that." (Tr. at 234). Accordingly, Manshul performed the work needed to reframe the sheetrock, at a cost of $2,117.50, including overhead and profit. (Tr. at 236; Exhibit 69). Plaintiff made no attempt to dispute this claim.

Consequently, Manshul is entitled to backcharges of $326.70 for the cost of repairing the malfunctioning fire alarms, plus $2,117.50 for the cost of reframing the sheetrock around the fire alarms.

*Misplacement of Exterior Light Box*

Mr. Haugland testified that Perosi installed an exterior light box on the loading dock in the wrong location. He stated that he asked Mr. Santiago "to take care of it" but that "he never did." (Tr. at 254). Because Perosi failed to relocate the light box, Manshul assigned an employee to do the work, at a cost of $349.90, including overhead and profit. (Tr. at 255; Exhibit 81).

Plaintiff made no attempt to dispute or contradict this claim. Accordingly, Manshul is entitled to a backcharge of $349.90 for performing this work.

*The Pre–Action System*

According to Manshul, the Electrical Subcontract Agreement required Perosi to install the electrical wiring for the pre-action system, a part of the fire detection system. Manshul contends that, because Perosi failed to perform this work, it was forced to hire Maximum Electric to do so, at a cost of $12,100, including overhead and profit. (Tr. at 213–14; Exhibit 66).

Perosi, on the other hand, argues that the work on the pre-action system was not included in the Electrical Subcontract Agreement. To support this contention, it introduced into evidence certain correspondence between the parties indicating that Manshul had authorized Perosi to perform the electrical work on the pre-action system for the sprinkler alarms and acknowledged that such work was outside the contract. Specifically, a letter from Richard Perosi to Allan Schulman of Manshul, dated January 20, 1994 and admitted in evidence as Exhibit 6C, outlines the terms of an agreement for Perosi to complete work on the pre-action system "on a cost plus basis." The letter states that "[p]ayment terms will be 5 days after receipt of billing." In addition, two letters from Manshul confirm that it agreed to compensate Perosi separately for work performed on the pre-action system. The first is a handwritten note addressed to Perosi Electric and

signed by Lawrence Horowitz, Project Manager for Manshul, which states: "You are hereby authorized to wire the pre-action system. The work is to be done this week. The cost for this work is to be discussed at a later date." In addition, after the signature appears the handwritten statement "Supt. will sign for time and material sheets." The note is dated January 11, 1994 and was admitted in evidence as Exhibit 6B. The second is a letter from Mr. Horowitz to Richard Perosi, dated January 21, 1994 and admitted in evidence as Exhibit 6A, which states:

> We acknowledge receipt of your letter dated Jan. 20, 1994 regarding the electrical work for the pre-action system for the sprinkler. Please be advised that we agree with the terms of your letter with the exception that payment is to be made when 50% of the work is completed and the balance to be paid subsequent to final inspection and approval by the Navy.

Mr. Perosi acknowledged that plaintiff never performed the work on the pre-action system and is not seeking compensation for any such work. (Tr. at 99) Nonetheless, the correspondence clearly indicates an intention on Manshul's part to compensate Perosi on a "cost plus" basis for the work on the pre-action system, an intention it would not have exhibited had it believed the Electrical Subcontract Agreement to include such work.

Accordingly, Manshul is not entitled to a backcharge for the work performed by Maximum Electric to wire the pre-action system.

### Total Backcharges

Based on the foregoing, Manshul is entitled to total backcharges as follows:

| | |
|---|---|
| Punch List Work | $9,680.00 |
| "As Built" Drawings | $1,815.00 |
| Emergency Lighting | $553.00 |
| Ceiling Support Wiring | $12,755.22 |
| Removal of Temporary Lights and Wires | $6,898.21 |
| Waste Removal | $699.79 |
| Trailer Steps | $662.38 |
| Cable Revision | $5,808.00 |
| Malfunctioning Fire Alarms | $326.70 |
| Reframing Sheetrock | $2,117.50 |
| Exterior Light Box | $349.90 |
| **Total** | **$41,665.70** |

6. Mr. Perosi testified vaguely that he did recall "having conversations with Al Shulman and others at his office on extras" and that Perosi agreed during those conversations to perform certain work on a cost plus basis. (Tr. at 101). None-

### Extra Work

In addition to seeking payment for work performed pursuant to the terms of the Electrical Subcontract Agreement, Perosi seeks payment for "extra" work, defined by Richard Perosi at trial as "[a]ny work that's not described in the plans and specs or [that is] outside the contract." (Tr. at 37). According to Richard Perosi, Manshul agreed to pay the plaintiff company for all such extra work on a "cost plus" or "time and material" basis.

Mr. Perosi could not recall any specific instances in which he personally spoke with anyone at Manshul about billing on a "cost plus" or "time and material" basis. (Tr. at 98–99).[6] Nor did plaintiff introduce any correspondence, other than that relating to the pre-action system, in which Manshul agreed to compensate Perosi for extra work on a "cost plus" or "time and material" basis. Nonetheless, Mr. Haugland acknowledged that extra work was completed on a time and material basis and that he regularly signed time sheets to verify the time spent by Perosi performing extra work that Manshul had authorized. (Tr. at 281).

### The Standardized Waiver and Indemnity Forms

As an initial matter, Manshul contends that Perosi is barred from recovering for any extra work, pursuant to the terms of various standardized waiver and indemnity forms signed by Perosi in connection with four of its payment requisitions. The waivers are dated October 5, 1993, November 10, 1993, December 13, 1993 and January 11, 1994. Each contains the following language:

> And to induce the making of the payment hereby requisitioned, [Perosi] represents that it has no claims against Manshul Construction Corp. or the Owner to the date of this requisition and hereby waives and releases any and all claims, obligations, costs, expenses, causes of action and liens on the premises and/or improvement thereon, . . . .

theless, he did not describe any specific conversations in which Manshul agreed to compensate Perosi on a cost plus basis for specific extra work.

In support of its position, Manshul cites *Kay–R Electric Corp. v. Stone & Webster Construction, Inc.*, 23 F.3d 55 (2d Cir.1994). In that case, an electrical subcontractor sued the general contractor claiming that the general contractor's failures to excavate, pour footings, construct foundations and slabs for or erect structural steel for the buildings, enclose the buildings and complete the interiors in a timely manner created substantial delays which caused the subcontractor to incur substantial additional costs for labor, materials and storage. *Id.* at 56. As part of each requisition for payment, the subcontractor had signed a form that released the general contractor "from any claim or claims of whatever nature for materials furnished, labor performed or expense incurred to date which is not included in the above amounts or noted in the space above as provided therefor." *Id.* The form contained a number of blank lines, which appeared after the words: "Above does not include material furnished, labor performed, or expense incurred for which written authorization has not been given, as follows." *Id.* at 57–58.

The court in *Kay–R* found the release enforceable to bar the subcontractor's claims, and was especially persuaded by the language of the payment requisition form which gave the subcontractor the opportunity to list additional expenses that it had incurred and for which the general contractor was responsible. *Id.* at 58 ("Kay–R should have written in the additional expenses it is now claiming"). Thus, the court found that the subcontractor unambiguously had manifested an intent to release the general contractor from responsibility for the expenses the plaintiff allegedly had incurred from the delay. *Id.* at 57.

Here, by contrast, the release forms did not provide a space in which Perosi could list "extra" work that Manshul had authorized it to perform and for which it expected payment. Contrary to the release in *Kay–R*, which clearly and unambiguously related to claims in addition to those required under the fixed-fee contract, the release in the instant case refers ambiguously to "the payment hereby requisitioned" and "to the date of this requisition," terms which are meaningless given the fact that Manshul's payments to Perosi did not usually correspond to the specific requisition forms it submitted. (*See* Exhibit 42).

If anything, that language implies that Perosi was agreeing to waive all claims with respect to payments due under the *contract* only. However, as plaintiff points out, Manshul concedes that it continues to owe Perosi the balance due under the contract, minus backcharges for incomplete or defective work. Manshul's concession that there remains an outstanding contract balance (*see* Defendant's post-trial brief at 15) is wholly at odds with both the terms of the release and its contention that the releases bar payment for "extra" work.

The other cases cited by Manshul on this point are similarly inapposite. *See Conway v. Town of Islip*, 194 A.D.2d 710, 600 N.Y.S.2d 106 (2d Dep't 1993) (contractor's claim for damages due to Town's alleged performance delays barred by contract, which stated explicitly that acceptance of final payment released Town from all claims in connection with the contract); *Hoyecki v. City of New York*, 121 A.D.2d 905, 503 N.Y.S.2d 801 (1st Dep't 1986) (plaintiff contractor's claims for delay damage, extra work and balance due under contract barred where contractor, in unambiguous language, had waived and released all damage claims it might have against the city in connection with the contract); *Mars Assocs., Inc. v. City of New York*, 70 A.D.2d 839, 418 N.Y.S.2d 27 (1st Dep't 1979) (upholding grant of summary judgment against plaintiff contractor which sued for damages flowing from delay after executing release in which it agreed to waive all claims against the city arising out of the contract, with the exception of specific change orders listed on the release); *New Again Construction Co. v. City of New York*, 76 Misc.2d 943, 351 N.Y.S.2d 895 (Sup.Ct., Kings County 1974) (defendant city was estopped from enforcing waiver of claim for extras where it engaged in unconscionable conduct by giving plaintiff oral assurances that waiver language was meaningless).

As noted above, vague or ambiguous contract terms must be construed against the party who prepared the contract. *Wong v.*

*Michael Kennedy P.C.*, 853 F.Supp. 73 at 80; *Jacobson v. Sassower*, 66 N.Y.2d at 993, 489 N.E.2d at 1284, 499 N.Y.S.2d at 382; *67 Wall St. Co. v. Franklin Nat'l Bank*, 37 N.Y.2d at 249, 333 N.E.2d at 187, 371 N.Y.S.2d at 918; *Willis v. New York City Police Dep't*, 214 A.D.2d at 428, 625 N.Y.S.2d at 44. Since the language in the standardized waiver and indemnity forms, unlike that in *Kay–R* and the other cases described above, is subject to different interpretations, it is unenforceable against Perosi. Accordingly, each of plaintiff's claims for "extra" work will be examined individually.

*VAV Wiring*

■ As stated above, the Electrical Subcontract Agreement states explicitly that "control wiring" is excluded from the contract, *except where "shown on the electrical drawings under requirements of the electrical specifications."* (emphasis supplied) The agreement also expressly excludes "H.V.A.C. Control Wiring."

During the course of the Project, Manshul demanded that Perosi install electrical wiring from the VAV, or variable air volume, low voltage transformer boxes to feed controls for heating and ventilation equipment. A dispute ensued between Perosi and Manshul as to whether the wiring for the VAV boxes constituted "control wiring," or "HVAC control wiring," or was included within the electrical specifications.

According to Richard Perosi, Allen Schulman requested that Perosi complete the wiring for the VAV boxes. (Tr. at 38) A letter dated April 27, 1993 to Perosi from Donald Warnett, Project Manager for Manshul, opines that the VAV wiring is included in the contract specifications. (*See* Exhibit 8; Tr. at 111) A reply letter dated April 28, 1993 from Al Santiago, Project Manager for Perosi, to Donald Warnett refers to such wiring and states: "You have previously been informed that this work is not in our contract or specifications. We refer you to page # 18, 2.2.4. of section # 15971." Mr. Warnett then responded by letter dated May 21, 1993. The letter states:

Contrary to what you indicate, this electrical work is within your contract to perform. Your reference to specification section 15971 is acknowledged. In this regard your contract with us indicates that you are to provide all electrical work, the exclusion to this being control wiring which is clearly noted and excluded in the contract between Manshul and Perosi. No other exclusion, regarding wiring is listed. . . . This will direct you to perform the noted work at issue, that is, the wiring at the VAV boxes.

*See* Exhibit 13.

At trial, Richard Perosi testified that the electrical work Manshul demanded was part of the HVAC system and constituted control wiring. (Tr. at 40). He further testified that such wiring was not contained or specified in the electrical drawings for the Project. (Tr. at 41). Nonetheless, after receiving the letter dated May 21, 1993 from Donald Warnett, Perosi performed the work, which consisted of "[r]unning lines from the panel boxes up to various locations in the building, installing a box and a transformer." (Tr. at 41) Richard Perosi testified that he instructed Perosi's electrical foreman, Joe Sles, and project manager Al Santiago to keep track of the costs involved in performing the VAV wiring "on a cost-plus basis" and to "bill it out." (Tr. at 42).

In an attempt to document Perosi's costs incurred in completing the control wiring for the VAV boxes, plaintiff introduced into evidence an invoice dated April 22, 1994. The invoice is directed to the attention of Al Schulman at Manshul and states: "As per your directive, dated 5/21/93 (see attached)[7], proceeded with powering of VAV boxes for mechanical contractor's work. This work was not part of the Electrical Contract." Under the heading "Labor" the document states "4 men—7 hours per day for 3.5 weeks = 490 total hours @ 56.64" for a total of $27,253.60. Under the heading "Material" the document lists "3000'–½″ EMT Conduit" at $630.00, "Fittings & Supports 30%" at $189.00, "7000' # 12 THHN @ $67.00M" at $469.00, and "100 Flex Trails with Boxes @ $6.18 ea." at $618.00, for a total of $1,906.00.

7. Such attachment was not introduced in evidence.

The document then lists the subtotal of $29,-159.60 and adds ten percent overhead at $2,915.96 and ten percent profit at $3,207.56, for a total of $35,283.12. Manshul does not dispute Perosi's contention that it performed this work (Tr. at 287–88) or Perosi's calculation of the labor and materials expended.

Mr. Perosi explained that his company's procedure for maintaining cost records for "extra" work was as follows:

> Normally, we would get some time sheets from the field. They would come into the project manager. He would review them and give it to the bookkeeper to prepare a bill and send it.

(Tr. at 48). He further testified that these "T & M submissions" were reviewed by Perosi's "foreman or subforeman, whoever did that particular work" and by a representative of Manshul before they were billed. (Tr. at 49). However, Mr. Perosi conceded that he did not personally review the T & M submissions with Manshul at any time, nor did he keep time records for the VAV work or personally have any conversations with anyone at Manshul concerning the VAV work prior to this lawsuit. (Tr. at 49, 118–19).

Mr. Perosi explained that the wiring leading to the VAV box is "110 volts" (Tr. at 113), and that wiring that exits the VAV box and leads to thermostats and other appliances is 24 volts. (Tr. at 114). According to Richard Perosi, plaintiff completed both the 110 volt and the 24 volt wiring, both of which, he testified, were specifically excluded under the Electrical Subcontract Agreement. (Tr. at 114) Since plaintiff received payment for the 24 volt wiring from the HVAC contractor (Tr. at 114), it seeks compensation from Manshul for the 110 volt VAV wiring only.

Section 15971, paragraph 2.2.4, of the specifications, admitted in evidence as Exhibit 14, requires the *mechanical subcontractor* to:

> [p]rovide complete electric wiring for temperature control apparatus, including wiring to transformer primaries. Control circuit conductors which run in same conduit as power circuit conductors shall have same insulation level as power circuit conductors. *Circuits operating at more than 100 volts shall be in accordance with Section 16402, "Interior Wiring Systems"* [contained within the specifications for the electrical subcontractor]. Interior wiring systems circuits operating at 100 volts or less shall be defined as low voltage and shall be run in rigid or flexible conduit. (emphasis supplied)

Defendant also points to section 16011, paragraph 1.11.1 of the specifications, which directs Perosi to:

> [p]rovide electrical components of mechanical equipment such as motors, motor starters, control or push button station, float or pressure switches, solenoid valves and other devices functioning to control mechanical equipment and control wiring and conduit for circuits rated at 100 volts or less specified in section covering the associated mechanical equipment rather than in division 16. Extended voltage range motors will not be permitted. *The interconnecting power wiring and conduit, control wiring rated 120 volts (nominal)* [8] *and conduit, and the electrical power circuits shall be provided under Division 16.* [9]

Mr. Perosi stated that, pursuant to these specifications, all low voltage wiring was "part of the HVAC contract," and thus was not part of Perosi's electrical subcontract. (Tr. at 117) He further testified that "low voltage" means "anything under 120 volts" (Tr. at 117) and that, pursuant to section 16011, paragraph 1.11.1 of the specifications, anything less than 100 volts was covered by the specifications for the mechanical subcontractor. (Tr. at 118) Mr. Perosi interpreted the Electrical Subcontract Agreement as excluding all control wiring, including 110 volt control wiring, and he testified that the wiring for the VAV boxes did not appear on the electrical drawings. (Tr. at 145).

However, Mr. Haugland testified that the 110 volt wiring that leads to the VAV box is part of the interconnecting power wiring and conduit and thus is covered under Division 16 and is Perosi's responsibility under the contract. (Tr. at 279) Mr. Oprescu confirmed

---

8. Mr. Oprescu testified that 120 volts (nominal) equals 100 volts. (Tr. at 223).

9. It is undisputed that Division 16 constitutes the electrical specifications.

Mr. Haugland's interpretation of the specifications. He testified that the 24 volt wiring exiting the VAV box was "under the HVAC contract," but that the 110 volt wiring leading to the VAV box was "claimed on the electrical contract" because it was more than 100 volts. (Tr. at 216). Mr. Oprescu further stated that it is standard in the industry for the electrical subcontractor to have responsibility for all wiring that is more than 100 volts. (Tr. at 216).

More importantly, however, Richard Perosi admitted on cross-examination that Perosi and Manshul never reached a meeting of the minds as to whether the VAV wiring was included within the electrical specifications or constituted extra work, outside the contract. Indeed, after receiving the May 21, 1993 letter from Mr. Warnett, plaintiff made no effort to contact Manshul again concerning the VAV work until after it commenced this lawsuit. (Tr. at 281). Mr. Perosi explained that he personally viewed the VAV wiring as extra work, but that *he did not know how Manshul viewed it.* (Tr. at 112) (emphasis supplied).

Ultimately, then, the court need not engage in an analysis of the contract terms. Even assuming, *arguendo,* that the work on the VAV system was not included within the electrical specifications, plaintiff may not recover for that work absent an explicit agreement by Manshul to compensate it outside the contract. In essence, Mr. Perosi conceded that Manshul never explicitly agreed to compensate Perosi on a "time and material" or "cost plus" basis for the work on the VAV system. Without any such agreement, Perosi is not entitled to recover damages for that work.

### Temporary Lighting & Repairs to Conduit for Site Lights

Plaintiff contends that Manshul requested that it provide and maintain temporary light and power to perform "miscellaneous site work" and that Perosi did so. Plaintiff also contends that, upon request, it replaced and repaired a damaged conduit for certain site lights. According to plaintiff, such work was not included in the Electrical Subcontract Agreement, and thus constitutes "extra" work for which it should be compensated

separately. To support this claim, plaintiff introduced into evidence as Exhibit 44 a "T & M folder" containing various documents, including correspondence, invoices and time sheets.

Among those documents is an invoice dated December 27, 1993 from Perosi to Manshul. At the top of the invoice appear the words "Temporary Light for Headquarters Facility Building." The document lists three different dates on which such work was allegedly performed. Under the first date, December 4, 1993, the document states: "1 Foreman—7 hours O.T. @ $108.23" for a total of $757.61. The exact same statement appears under the second and third dates, December 11, 1993 and December 18, 1993, respectively, and the document lists the total amount due as $2,272.83.

Attached to this document are three time sheets for the above dates, each reflecting that a foreman worked seven hours on "Temporary Light" and each signed by Alfred Haugland, Project Manager for Manshul. Directly above the signature on the December 4, 1993 time sheet appear the handwritten words "Subject to Contract. Verify Time Spent only." Above the signature on the December 11, 1993 time sheet appear the handwritten words "Subject to Contract. Verify Time & Mat. only," and above the signature on the third time sheet appear the words "Subj. to Contract Req. Verify time & mat."

Also included in the folder is an invoice from Perosi to Manshul dated December 6, 1993. At the top of the invoice appear the words "Furnished Temporary Light & Power." The document lists three different dates on which such work was allegedly performed. Under the first date, November 6, 1993, the document states: "1 Foreman—7 hours O.T. @ $108.22," but it lists the total dollar amount for that date as $108.22. The exact same statement appears under the second and third dates, November 13, 1993 and November 26, 1993, respectively, and the document lists the subtotal amount due for temporary light and power as $324.66. Beneath these figures appear the words "Replaced & Repaired damaged Conduit for Site Lites." Under the date, November 30, 1993,

the document lists: "1 Journeyman—3 Hrs. S.T. @ $67.90" for a total of $203.70, and "1 Apprentice—3 Hrs. S.T. @ $29.65" for a total of $88.95. It then lists the subtotal amount due for such repairs as $292.65 and the total amount billed as $617.31.

Attached to this invoice are four time sheets. Each of the first three, dated November 6, 1993, November 13, 1993 and November 26, 1993, reflects seven hours of "O.T." performed by a "Journeyman" on "Temp Lite & Power." The final time sheet, dated November 30, 1993, reflects three hours of work performed by a "Journeyman" and an "Apprentice" to "Replace and Repair Damaged Conduit for Site Lites." All of these time sheets are signed by Alfred Haugland under the handwritten words "Verify Time Spent."

In addition, included within a separate "T & M folder," admitted into evidence as Exhibit 43, are various invoices and time sheets for work performed installing and maintaining temporary lighting. They are as follows:

1. An invoice dated January 5, 1993 for "Temporary Lights for Concrete Pour" listing one Journeyman working overtime two and a half hours at the rate of $97.95 per hour, plus ten percent overhead and ten percent profit, for a total of $296.31. A time sheet dated December 21, 1993, signed by Alfred Haugland, substantiates plaintiff's claim that it performed this work, and a letter dated January 27, 1993 from Donald Warnett, Project Manager at Manshul, to a company called WWC indicates that Manshul billed WWC $358.00 in backcharges for work performed by Perosi on December 21, 1992 to allow for WWC's pouring of concrete "after normal working hours." The bill includes a twenty-one percent "general contractor's override for profit and overhead."

2. An invoice dated December 10, 1992 for "Temporary Light and Power For Extended Hours" listing one Journeyman working overtime two and half hours at the rate of $80.94, plus ten percent overhead and ten percent profit, for a total of $244.85. A time sheet dated November 26, 1992, signed by Alfred Haugland, substan-tiates plaintiff's claim that it performed this work.

3. An invoice dated November 19, 1992 for "Temporary Light and Power—For Extended Hours" listing one Journeyman working overtime five hours at a rate of $80.94, plus ten percent overhead and ten percent profit, for a total of $489.69. Time sheets dated November 11, 1992 and November 12, 1992, both signed by Alfred Haugland, substantiate plaintiff's claim that it performed this work.

4. An invoice dated November 4, 1992 for "Temporary Light and Power Holi-day—Overtime" listing one Journeyman working overtime eight hours at a rate of $80.94, plus ten percent overhead and ten percent profit, for a total of $783.50. A time sheet dated November 3, 1992 signed by Alfred Haugland and endorsed with the handwritten words "To cover for trades working subject to contract," substantiates plaintiff's claim that it performed this work.

5. An invoice dated October 30, 1992 for work done to "Remove Temporary Quartz Lights from 2nd Floor and Re-Install on Third Floor, and Add Four Additional Quartz Units as per Manshul's Direction" listing one Foreman, one Journeyman and one Apprentice, each working seven hours at varying hourly rates, for a total labor cost of $960.12, plus materials costing $307.03, ten percent overhead and ten percent profit, for a total of $1,533.26. A time sheet dated October 8, 1992, signed by Alfred Haugland, substantiates plaintiff's claim that it performed this work.

6. An invoice dated October 30, 1992 for "Additional Quartz Lighting for Concrete Night Pour" listing one Journeyman working two hours at the rate of $55.71 per hour and one Apprentice working two hours at $24.00 per hour, plus ten percent overhead and ten percent profit, for a total of $338.92. An unsigned time sheet, dated October 15, 1992, accompanies this invoice.

7. An invoice dated October 30, 1992 for "Temporary Light and Power for Concrete Night Pour—Overtime" listing one Journeyman working 7.5 hours at $83.57, plus ten percent overhead and ten percent

profit, for a total of $758.41. An unsigned time sheet, dated October 15, 1992, accompanies this invoice, and a letter dated November 11, 1992 from Donald Warnett, Project Manager at Manshul, to WWC indicates that Manshul billed WWC $917.68 in backcharges for work performed by Perosi on October 15, 1992 to "provide a standby electrician during [WWC's] concrete pour that ran into overtime hours." The bill includes a twenty-one percent general contractor's override for profit and overhead.

8. An invoice dated October 14, 1992 for "Temporary Light and Power for Concrete Night Pour—Overtime" listing one Journeyman working nine hours at an hourly rate of $80.94, plus ten percent overhead and ten percent profit, for a total of $881.44. A time sheet dated October 7, 1992, signed by Alfred Haugland, substantiates plaintiff's claim that it performed this work.

9. An invoice dated October 8, 1992 entitled "Extra Work Order: 2nd Floor Concrete Pour Light and Power" listing one Foreman, one Journeyman and one Apprentice, each working seven hours at varying hourly rates, for a total labor cost of $960.12, plus materials costing $140.00, for a total of $1,100.12.

With the exception of the invoices dated December 27, 1993, October 30, 1992 and October 8, 1992, all of the above invoices are substantiated by Alfred Haugland's signature verifying the time spent or by a bill indicating that Manshul charged another subcontractor for the work performed by Perosi. Accordingly, Perosi is entitled to compensation pursuant to each of those invoices. Mr. Haugland made a point of indicating on the time sheets related to the December 27, 1993 invoice that the work performed was subject to the contract; this demonstrates that, although it is undisputed that Perosi performed the work, there is a dispute as to whether or not the work was included in the contract. Plaintiff introduced no evidence to suggest that Manshul agreed in advance to compensate it for the work related to the December 27, 1993 invoice. Absent any such agreement, Perosi may not recover for that

work. In addition, the October 30, 1992 invoice is accompanied by an unsigned time sheet, and the October 8, 1992 invoice is not accompanied by any time sheet or other verification. Again, absent some proof to suggest that Manshul agreed to compensate it for this work, Perosi may not recover for the time and material related to these invoices.

Accordingly, Perosi is entitled to recover a total of $5,604.77 for the work it performed providing and maintaining temporary light and power.

*Repairs to Overhead Wires*

Next, plaintiff seeks compensation for work it allegedly performed repairing damaged overhead wires. To support this claim, plaintiff introduced into evidence, as Exhibit 45, an invoice from Perosi to Manshul, dated July 2, 1992. The invoice contains the heading "Repair to overhead wires damaged by boom of crane" and lists labor performed by two journeymen, seven hours each at a rate of $61.16 per hour, for a total of $856.24. Under "Equipment" the document lists a "Bucket truck—1 day at $350.00." The total amount of the invoice thus is $1,206.24.

Attached to this invoice is a weekly grid-pattern time sheet for the week ending July 1, 1992. Next to the names "Aiello, G." and "Rooney, K.," under the designation "ST" appears a number "7," indicating that each employee worked seven hours. The time sheet does not indicate the type of work performed and is unsigned.

In addition, plaintiff introduced as Exhibit 46 an invoice from Perosi to Manshul, dated October 7, 1993, which contains the heading "Repair Temporary Overhead Lines Damaged by Backhoe." Under "Labor" the document lists one Foreman for seven hours at $72.15 per hour, and one Journeyman for seven hours at $67.90 per hour, for a labor subtotal of $980.35. Under "Material" the document lists "1 Lot" at $38.00. After adding in ten percent overhead and ten percent profit, the invoice lists the total amount due as $1,232.20. Correspondence included within Exhibit 46 indicates that on October 13, 1993 Manshul billed a company called Cross Bay Contracting Corporation backcharges totaling $1,491.00 (or $1,232.20, plus overhead and profit) for work performed by Perosi

repairing temporary overhead lines damaged by that company's equipment.

Also included within Exhibit 46 is a second invoice from Perosi to Manshul, dated September 16, 1993, for repairs to temporary lines damaged by a backhoe. The invoice lists one Foreman for seven hours at $72.15 per hour and one Journeyman for seven hours at $67.90 per hour, for a labor subtotal of $980.00. Also listed on the invoice are charges for various materials, totaling $38.00. The invoice is signed by Alfred Haugland.

Since the July 2, 1992 invoice is not supported by signed time sheets or other documentation to demonstrate that Manshul agreed to compensate it for that work, Perosi may not recover for the work related to that invoice. However, the remaining two invoices are supported by sufficient documentation to suggest that Manshul agreed to compensate it for that work. Accordingly, Perosi is entitled to $2,250.20 for the extra work it performed repairing overhead wires.

### Repairs to Collapsed Duct

Next, Perosi seeks compensation for work it performed repairing a collapsed duct. As its sole evidence in support of this claim Perosi introduced, as part of the T & M folder marked as Exhibit 43, a copy of an invoice dated July 26, 1993, which contains the description: "Repair collapsed duct approximately two (2) 8' sections. Ball and brush prior to repair and after repairs were completed. Test of ball and brush observed by C.Q.C. Representative—Mr. Snyder." Under the heading "Labor," the document lists "2 men—14 hours at $65.00" for a total of $910.00. After adding in $124.30 for materials, ten percent overhead at $103.43, and five percent profit at $56.89, the invoice lists the total amount due as $1,194.62.

This invoice is not supported by contemporaneous signed time sheets or any other documentation. The invoice provides evidence that Perosi billed Manshul $1,194.62, but does not by itself establish that (1) Perosi's employees actually performed the work, or (2) Manshul agreed in advance to compensate Perosi for performing this work. Absent some other proof, Perosi is not entitled to compensation for the work related to these repairs.

### Wiring for Radio Transmitter

Plaintiff seeks compensation for extra work it allegedly performed wiring a radio transmitter. To support this claim, plaintiff introduced into evidence, as part of Exhibit 43, the following documents:

1. An invoice dated January 5, 1992 entitled "Wiring for Radio Transmitter." Under the heading "Labor," the document lists (1) one Foreman working five hours at $57.45 per hour, for a total of $287.25, (2) one Journeyman working five hours at $53.96 per hour, for a total of $269.80, and (3) one Project Manager working five hours at $57.45 per hour, for a total of $287.25. After adding in ten percent overhead of $84.83 and ten percent profit of $92.87, the document lists the total amount due as $1,021.60; and

2. An unsigned time sheet dated August 13, 1992, which contains the explanation "Wiring for Radio Transmitter." The time sheet lists one Foreman and one Journeyman each as having worked five hours.

These documents contain some evidence that Perosi billed Manshul $1,021.60, and that Perosi's employees actually performed the work, but they do not establish that Manshul agreed in advance to compensate it for this work on a "time and material" or "cost plus" basis. Absent some evidence regarding such an agreement, Perosi may not recover for the cost it incurred installing the radio transmitter wiring.

### Miscellaneous "T & M" Work

Finally, plaintiff seeks compensation for a variety of miscellaneous tasks, allegedly performed on a "time and material" basis. Plaintiff's documentation for such work is as follows:

1. An invoice dated September 30, 1992, introduced into evidence as part of Exhibit 43 and entitled "Miscellaneous T & M Work," which lists (a) three hours of labor at an hourly rate of $55.71 for work done on September 21, 1992 to connect a welding machine, (b) six hours of labor at an hourly rate of $55.71 for work done on September 24, 1992 to relocate a power

pole, plus $100 for a "Bucket Truck," and (c) twenty hours of labor at an hourly rate of $55.71 for work done on September 28 and 29, 1992 to close openings in electrical and telephone ducts, for a total of $1,715.59. A time sheet dated September 21, 1992, which is signed by Alfred Haugland, substantiates plaintiff's claim that it performed the work necessary to connect the welding machine. A time sheet dated September 24, 1992, which is signed by Alfred Haugland, substantiates plaintiff's claim that it performed the work related to the power pole, and a letter dated November 17, 1992 from Donald Warnett at Manshul to the Department of the Navy requests $563.00 in compensation for the work done by Perosi to relocate the power pole. Time sheets dated September 28 and 29, 1992, signed by Alfred Haugland, substantiate plaintiff's claim that it performed the work related to the electrical and telephone ducts.

2. An invoice dated August 31, 1992, introduced into evidence as part of Exhibit 43 and entitled "Temporary for Iron Worker's Welding Machine—(2nd Set)," which lists (a) seven "Journeyman Hours" at $55.71 per hour, (b) seven "Apprentice Hours" at $24.00 per hour, and (c) materials costing $495.50, including ten percent overhead and ten percent profit, for a total of $1,053.47. A time sheet dated August 26, 1992 and signed by Alfred Haugland substantiates plaintiff's claim that it performed this work.

3. An invoice dated August 19, 1992, introduced into evidence as part of Exhibit 43 and entitled "Temporary for Iron Worker's Welding Machine" which lists (a) eight "Journeyman Hours" at $55.00 per hour, (b) eight "Apprentice Hours" at $24.00 per hour, and (c) materials costing $477.63, including ten percent overhead and ten percent profit, for a total of $1,109.63. An unsigned time sheet dated August 12, 1992 accompanies this invoice.

Once again, the September 30, 1992 and August 31, 1992 invoices are supported by signed time sheets, which indicate Manshul's implicit agreement to compensate Perosi for that work. The remaining invoice is accompanied by an unsigned time sheet, and thus is not compensable.

Accordingly, Perosi is entitled to $2,769.06 for this miscellaneous work.

*Total Damages*

Based on the foregoing, Perosi is entitled to damages for "extra" work as follows:

| | |
|---|---|
| Temporary Lighting & Repairs | $5,604.77 |
| Repairs to Overhead Wires | $2,250.20 |
| Miscellaneous "T & M" Work | $2,769.06 |
| **Total** | **$10,624.03** |

Accordingly, plaintiff's total damages are calculated as follows:

| | |
|---|---|
| Amount Due under Contract | $114,755 |
| Backcharges | ($ 41,665.70) |
| Extra Work | $ 10,624.03 |
| **Total** | **$ 83,713.33** |

In addition, plaintiff is entitled to prejudgment interest at the legal rate provided by state law. *See, e.g., United States Dep't of Navy for Benefit of Andrews v. Delta Contractors Corp.,* 893 F.Supp. 125, 132 (D.P.R. 1995) ("On the matter of interest [in cases brought under the Miller Act], the majority of Federal Courts have held that the right of interest is determined by the law of the state in which the work was performed") (citing cases). New York Civil Practice Law and Rules ("CPLR") § 5001 provides for interest on breach of contract claims. Under subsection (b) of that rule, interest "shall be computed from the earliest ascertainable date the cause of action existed." The statutory interest rate is nine percent per year. CPLR § 5004.

Here, plaintiff has requested prejudgment interest from February 17, 1994. (See First Amended Complaint at ¶ 11). Defendant has not objected to the application of that date as the "earliest ascertainable date the cause of action existed." As there is no dispute on this point, interest on Perosi's award of $83,713.33 will be applied at a rate of nine percent per year beginning on February 17, 1994.

The court cannot compute the actual amount of interest due at this juncture, as the final figure will depend on the date of entry of judgment. Accordingly, the Clerk of the Court is respectfully requested to com-

pute the final interest figure in accordance with the standard set forth herein.

Pursuant to the payment bond described *supra*, wherein Manshul and Aetna bound themselves jointly and severally to all persons furnishing labor or materials in connection with the Project, defendant Aetna is jointly and severally liable to Perosi for the total amount due hereunder.

## Conclusion

WHEREFORE, IT IS ORDERED, DECREED AND ADJUDGED that plaintiff Perosi Electrical Corporation recover from defendant Manshul Construction Corporation and defendant Aetna Casualty and Surety Company, jointly and severally, the principal amount of $83,713.33, plus interest accruing at nine percent per year beginning on February 17, 1994. The actual interest award shall be computed by the Clerk of the Court in accordance with the findings made above.

Judgment shall be entered accordingly.

IT IS SO ORDERED.