Edward E. LUCENTE, Plaintiff,

v.

INTERNATIONAL BUSINESS
MACHINES CORPORATION,
Defendant.

No. 99 Civ. 3987(CM).

United States District Court,
S.D. New York.

Oct. 5, 2000.

David R. Quittmeyer, Douglas L. McCoy, Hand Arendall, L.L.C., Mobile, AL, for Edward E. Lucente, plaintiff.

Peter T. Barbur, Cravath, Swaine & Moore, New York City, for I.B.M., defendant.

MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANT'S CROSS–MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON ISSUES OF LIABILITY AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S CROSS–MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE MEASURE OF DAMAGES

McMAHON, District Judge.

*Summary*

Plaintiff Edward Lucente sued International Business Machines Corporation ("IBM") for payment of stock options and restricted stock granted to him over the course of his thirty years of employment with IBM, which IBM had withheld after Lucente took up employment with a competitor. Lucente moved for summary judgment on the grounds that IBM's non-competition provisions are not enforceable against him. IBM filed several cross-motions on issues of liability and damages. For the reasons stated below, Plaintiff's motion for summary judgment on the issue of liability is granted and the Defendant's cross-motions addressing liability are denied. Defendant's motion for partial summary judgment on the question of damages is granted in part and denied in part. A trial will be held to determine damages.

I

FACTUAL BACKGROUND

The following facts are undisputed:

Edward Lucente worked for IBM from 1961 until 1991. During the course of his 30–year employment at IBM, Lucente participated in several incentive award programs, including a program through which he was awarded certain restricted stock and another which awarded him stock options. The purpose of such awards is twofold: to promote loyalty to the company, and to tie executive compensation to stock performance and thus to the profitability and growth of the company. As is typical of such executive incentive programs, Lucente's stock and stock option awards were subject to certain forfeiture-for-competition provisions,[1] which authorized IBM to cancel any deferred, unpaid or unexpired awards if Lucente ever went to work for any company that IBM deemed a competitor. The clauses contain no limitations for time, place and scope. These noncompete clauses state, in essence, that an executive is entitled to receive the awards for as long

---

1. Plaintiff disputes whether the 1982 Plan contemplates that the restricted stock be sub-

as he remains in the employ of IBM or, in the event he leaves IBM, he does not do so to work for a company that competes with IBM.

By 1991, Lucente had been promoted to the position of President of the Asia–Pacific Operation, and was one of a handful of senior executives reporting directly to the CEO, John Akers. In late 1990, Akers, unhappy with the results in the Asia–Pacific Division, told Lucente that it would be in the best interests of both Lucente and IBM if Lucente sought employment elsewhere. (Akers Dep. at 95). Lucente, believing that he was being asked to leave IBM, pursued an opportunity at Northern Telecom. With the express understanding from Akers and IBM that his move to Northern Telecom would be deemed not to be competitive with IBM (and thus would not trigger forfeiture of his long-term compensation package), Lucente retired from IBM in February 1991. As part of his retirement package, IBM paid Lucente a lump-sum severance equivalent to approximately one year's salary, or $675,000. Lucente worked for Northern Telecom in the position of Senior Vice President, Marketing until November 1992, when he announced his resignation, to take effect March 1993.

On April 14, 1993, Lucente joined Digital Equipment Corporation ("Digital"), where he worked for approximately one year. On April 15, 1993, IBM notified Lucente that IBM was canceling his outstanding stock options and restricted stock awards, because IBM deemed Lucente's employment at Digital to be "competitive employment." (Letter to Lucente from Donald Edman, Apr. 15, 1993, attached to Plaintiff's Aff. as Exh. 1.) IBM did not demand reimbursement of the $675,000 severance payment at that time.

Over the years, Lucente has sought, without success, to have IBM reverse the forfeiture decision. He filed this suit on February 24, 1999.

ject to forfeiture-for-competition. *See* discus-

*Procedural History*

Lucente sued for breach of contract to recover restricted stock and stock options, damages and related relief. IBM filed two counterclaims: (1) to recover the $675,000 severance payment IBM made to Lucente in 1991, and (2) to recover payments IBM made on behalf of Lucente to a tax reconciliation account maintained while he was an IBM employee. Lucente has conceded that IBM should prevail on the later counterclaim. He emphatically contests the former.

IBM moved under Fed.R.Civ.P. 12(c) for judgment on the pleadings. This Court denied IBM's motion, except with respect to the uncontested tax reconciliation claim, which Plaintiff has satisfied. *See Lucente v. IBM*, 75 F.Supp.2d 169 (S.D.N.Y.1999) Familiarity with this opinion is presumed. In pertinent part, I observed that forfeiture for competition clauses were sometimes enforceable under New York law without regard to their reasonableness, but only when the employee had the choice of remaining in the employ of the employer who seeks to restrict his moving to a competitor. *Id.* at 172–173 (discussing *Post v. Merrill Lynch, et al.*, 48 N.Y.S.2d 84, 421 N.Y.S.2d 847, 397 N.E.2d 358 (1979)). And I concluded that judgment on the pleadings would be inappropriate because nothing in the pleadings suggested that IBM either did or would have offered Lucente such a choice in the unusual circumstances of the case. *Id.* at 174.

Following discovery, Plaintiff now moves for summary judgment on all his claims and for summary judgment dismissing IBM's counterclaim for return of the severance payment. Instead of confining its arguments to the opposition papers to Plaintiff's motions that it filed, IBM has taken the tack of filing four additional separate motions for partial summary judgment to resolve the various legal issues in the case. This was a blatant attempt by IBM to circumvent this Court's

sion at Sec. II A.

rules on page-limits for motion papers and briefs. IBM's papers were duplicative. They were also far less persuasive than Plaintiff's concise opposing papers, which came well within the page limitations.

First, IBM seeks a declaration that the restricted stock awards are subject to forfeiture-for-competition under the terms of IBM's variable compensation plan. Second, IBM moves for a declaration by the Court that, so long as Lucente had a choice to remain at IBM when he retired in 1991, the employee choice doctrine applies to IBM's cancellation of his stock options and restricted stock in 1993, and precludes any inquiry into the "reasonableness" of the relevant forfeiture-for-competition provisions. Third, IBM moves for partial summary judgment on the proper measure of damages or, in the alternative, *in limine* to exclude the expert report and testimony of John Vaught, which underlies Plaintiff's damages claim. Fourth, IBM moves for dismissal of Plaintiff's statute of limitations, laches and estoppel defenses to its counterclaim. The first and second motions address the legal issues at the heart of Lucente's claim and are disposed of in connection with Plaintiff's motion for summary judgment. The issues raised in the fourth motion were briefed by Plaintiff in his motion for summary judgment on the counterclaim and are therefore addressed in the discussion of that claim. I address the question of damages last.

## II

### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the non-movant. *See Liberty Lob-*

*by,* 477 U.S. at 248, 106 S.Ct. 2505. In making its determination, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *See id.* at 255, 106 S.Ct. 2505. To defeat summary judgment, the non-moving party must go beyond the pleadings and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Because the record before this Court is devoid of any evidence from which a reasonable jury could find in favor of the Defendant on any of Plaintiff's claims for breach of contract, summary judgment is granted to Plaintiff on the issue of liability.

### A. *The Restricted Stock was Subject to Noncompete Provisions*

It is undisputed that between 1981 to 1990, Lucente was awarded 11,162 shares of restricted stock under the "IBM Variable Compensation Plan" (the "1982 Plan") and a predecessor plan, and 1,121 restricted shares under the "IBM Long–Term Performance Plan" (the "1989 Plan"). (Answer ¶ 3; Plaintiff's Mem. of Law in Support of Motion for Summary Judgment, Exh. 4.) It is also undisputed that from 1983 to 1991, Lucente was awarded options for 126,739 shares of IBM stock pursuant to the 1989 Plan. (Plaintiff's Mem. of Law in Support of Motion for Summary Judgment, Exh. 5.)

#### 1. *The 1982 Plan*

As a threshold matter, Plaintiff argues that the 11,162 shares issued to him under the 1982 Plan are not subject to forfeiture for competition, and that he is thus entitled to those shares as a matter of law. Lucente's argument is based on the fact that the forfeiture for competition clause of the 1982 Plan refers only to conditions placed on awards for which IBM is obligated to "make payment" as opposed to awards that IBM "delivers" to

the employee. He contends, in essence, that, because stock certificates are "delivered" and cash awards are "paid," the noncompete does not apply to stock awards. Defendant counters that the clear and unambiguous terms of the 1982 Plan place a forfeiture-for-competition condition on Lucente's shares.

■ This Court has already held that New York law governs the agreements at issue here. *See Lucente,* 75 F.Supp.2d at 172. Where the terms of an agreement are in dispute, it is a question of law for the Court to determine the meaning of the contract. *See Helmsley–Spear, Inc. v. New York Blood Center, Inc.,* 257 A.D.2d 64, 68, 687 N.Y.S.2d 353, 356 (1st Dept. 1999) ("Interpretation of an unambiguous contract provision is a function of the court, and matters extrinsic to the agreement may not be considered when the intent of the parties can be gleaned from the face of the instrument.") (internal quotation omitted). "It is axiomatic that vague or ambiguous contract language must be construed against the drafter." *U.S. v. Manshul Constr. Corp.,* 940 F.Supp. 492, 499 (E.D.N.Y.1996). "In cases of doubt or ambiguity, a contract must be construed most strongly against the party who prepared it and favorably to a party who had no voice in the selection of its language." *Jacobson v. Sassower,* 66 N.Y.2d 991, 993, 499 N.Y.S.2d 381, 382, 489 N.E.2d 1283 (1985). Anything less than total clarity, "even some level of ambiguity, will result in construction favoring [the nondrafter]." *Prescott, Ball & Turben v. LTV Corp.,* 531 F.Supp. 213, 217 (S.D.N.Y. 1981). Applying these standards, and construing all ambiguities against IBM, I find that the restricted stock awarded under the 1982 Plan is subject to forfeiture for competition.

The 1982 Plan defines "Restricted Stock" as "Stock which is awarded to an employee pursuant to the limitation contained in paragraphs 7, 8 and 12 below." (Bursor Decl.Exh. 2, ¶ 2(i)). However, under the heading "General Information Re-

garding the Plan" the Plan states that "[r]estrictions on transferability, and conditions of forfeiture of awards are contained in paragraphs 7(c), 8, 12 and 13 of the Plan." (*Id.* at p. 3.) Paragraphs 7, 8 and 12 make no reference to noncompetition. Paragraph 7 states in relevant part:

> After award of Restricted Stock, certificates for such shares will be deposited in escrow with the IBM Treasurer. The employee shall retain all rights in the Restricted Stock while it is held in escrow including but not limited to voting rights and the right to receive dividends, except that the employee shall not have the rights to transfer or assign such shares until all restrictions pertaining to such shares are terminated at which time the applicable stock certificates shall be released from escrow and delivered to the employee by the IBM Treasurer.

(*Id.* ¶ 7.) The only restriction in Paragraph 8 is that "the Committee will establish the period or periods after which the Restrictions on Restricted Stock will lapse." (*Id.* at ¶ 8.) Paragraph 12, entitled "Restrictions and Forfeiture," states in its entirety:

> The Company's obligation to *make payments* due hereunder *or* to *deliver stock* certificates held in escrow is subject to the condition that the employee remain and active employee of the Company for the entire deferral and/or restriction period, including mandatory and optional deferrals or until the employee's death, total and permanent disability, or retirement under a Company retirement plan if any of those events should sooner occur. If the employee fails to meet this condition, the employee's right to any such *unpaid amounts or undelivered stock* certificates shall be forfeited. This provision may be waived by the Committee in exceptional circumstances.

(*Id.* ¶ 12.) (emphasis added)

The only restriction in Paragraph 12 that was applicable to Lucente was that he remain an active employee until the time

of his retirement or until the expiration of the restriction period, whichever came first. IBM does not dispute that the first of these events to occur was Lucente's "retirement" under a plan agreed to by IBM, and that he was an active employee until the time of his retirement. Lucente therefore appears to have met the restrictions discussed in Paragraph 12.

Furthermore, Paragraph 12 clearly distinguishes between payment, which has to do with money, and delivery, which has to do with stock certificates. Plaintiff asserts that this distinction is important, because the noncompete clause of the 1982 Plan, which is contained in Paragraph 13, discussed only the payment of money, not the delivery of stock. Defendant contends that the noncompetition provisions of Paragraph 13 apply to all awards made under the 1982 Plan. I agree.

The relevant portion of Paragraph 13, entitled "Retirement" reads:

If the employee retires under a Company retirement plan, the Company's obligation *to make any payment due* thereafter under this Plan is subject to the Condition that for the entire period of deferral or restriction: [discussing noncompetition provisions].

(*Id.* ¶ 13.)

The definition of "Restricted Stock" clearly states that it is subject to the restrictions of Paragraphs 7, 8 and 12. Thus, under the doctrine of *inclusio unis es exclusio alteres*, it would appear that the 1982 Plan did not contemplate applying the restrictions discussed in Paragraph 13 to Restricted Stock awards. Defendant argues, however, that, because the "General Information" clearly notes that the restrictions of Paragraph 13 are applicable to "the Plan," generally, it must also apply to Restricted Stock:

Restrictions on transferability, and conditions of forfeiture of awards, are contained in paragraphs 7(c), 8, 12, and 13 of the Plan.

(*Id.* at p. 1). Defendant's reading is the only one that makes sense here, as it is the only interpretation of the contract that allows the Court "to give meaning to all of its language and avoid an interpretation that effectively renders meaningless a part of the contract." *Helmsley–Spear*, 257 A.D.2d at 69, 687 N.Y.S.2d at 357.

■ I further find that the inclusion of the language "stock delivery or payment" in Paragraph 12 and the abbreviated reference to "payment" in Paragraph 13, also does not render the noncompetition provisions of Paragraph 13 inapplicable to restricted stock. The 1982 Plan is replete with reference to "payment" in conjunction with restricted share awards. For example, Paragraph 7, discussed *supra*, is entitled "Payment of Awards," and includes "award of Restricted Stock." (*Id.* at ¶ 7.) Thus, the fair meaning of "payment" should be construed as including an "award" of shares. And, Defendant is correct that IBM's failure to name one former employee whose Restricted Stock was forfeited for alleged noncompetition does nothing to change this outcome; extrinsic evidence of the parties' intent is not required for a court to interpret the meaning of contract terms.

**B.** *The "Employee Choice" Doctrine Does not Apply*

■ Plaintiff argues that the employee choice doctrine does not apply for two reasons: (1) his departure was not "voluntary" for purposes of applying the employee choice doctrine, and (2) even if his departure from IBM could be deemed voluntary, the fact that IBM allowed Lucente to work for Northern Telecom renders the employee choice doctrine inapplicable to his subsequent employment with Digital— because IBM was not willing to employ Lucente at the time it cancelled the stock.

Defendant responds that Lucente's departure from IBM was voluntary and that, as such, the New York employee choice doctrine should be applied to Lucente's forfeiture of the stocks and options. De-

fendant argues that, as long as Lucente had the choice to remain with IBM when he left in 1991, the employee choice doctrine applies and precludes examination of the reasonableness of the forfeiture-for-competition provisions. As IBM frames the argument, "Lucente had the choice either to remain at IBM or to retire knowing that, to the extent he thereafter sought to work, he could not both work for a competitor and retain his IBM-granted stock options and restricted stock." (Def.Mem. for Partial Summary Judgment on Employee Choice Doctrine at 14–15.) Moreover, IBM contends that the decision to go to Digital in 1993 was a replay of the choice he had in 1991, i.e., to take a job with a competitor and give up the stock benefits. IBM therefore concludes that Lucente's voluntary retirement places this case squarely within the employee choice doctrine.

After reviewing the record before me, I hold that no reasonable juror could conclude that Lucente left IBM voluntarily. Thus, the employee choice doctrine does not apply.

■■ To find that the employee choice doctrine applies, an employer must show that it was willing to continue to employ the employee. *See Merrill Lynch,* 48 N.Y.2d at 89, 421 N.Y.S.2d at 849. The relevant inquiry is not whether the actual termination of the employer-employee relationship took the form of a resignation, retirement or firing, but whether the employer—the party seeking to enforce the non-compete agreement—was willing to retain the employee. For if an employer is not willing to keep an employee on, the employer would be hard pressed to justify the noncompete on the grounds of promoting long-term employee loyalty and retention or creating economic incentives for employee productivity.

■■ Courts have therefore been strict in requiring that employers put on evidence of their willingness to retain the employee before triggering the employee choice doctrine. Therefore, to overcome summary judgment, IBM must put on some evidence that it was willing to retain Lucente. Even "preliminary discussions and overtures" cannot qualify as continued willingness to employ. *See SIFCO Industries, Inc. v. Advanced Plating Technologies, Inc.,* 867 F.Supp. 155, 158 (S.D.N.Y. 1994). Moreover, the employer must be willing to retain the employee in his existing or a comparable position, with equivalent benefits, salary and employment conditions. *See Id.*

In SIFCO, the defendants were senior employees at a manufacturing plant that was purchased by plaintiff. The plant closed. SIFCO offered to retain each defendant as a consultant for a two-year period, but the offer was refused. SIFCO thereafter sought to enforce a noncompetition provision against the defendants, who started their own competing business. The court held that, because SIFCO could not come up with enough evidence to show that it offered to continue the defendants in their previous, or comparable, positions, with comparable salaries, employment conditions, and benefits, the noncompetition covenants were unenforceable as a matter of law.[2] *See Handel v. Nisselson,* No. 98 Civ. 6662, 1998 WL 889041, *3 (S.D.N.Y. Dec. 18, 1998) ("[I]n enforcing a non-competition covenant, a court must first find that the employer was willing to continue providing employment to the employee.")

The evidence in the record is as follows: Lucente was one of a handful of IBM executives who reported directly to the CEO, John Akers. Although all the other division heads also carried the title "Senior Vice President," Lucente's title was Vice President. Lucente himself testified that he had two or three conversations with

**2.** Judge Schwartz was clear that this lack of evidence sufficed to permit an award of summary judgment in favor of defendants. 867 F.Supp. at 159 fn. 4 (citing *Weintraub v. Schwartz,* 131 A.D.2d 663, 516 N.Y.S.2d 946, 948 (2d Dept.1987)).

Akers in which Lucente's departure form IBM was discussed. In September or October 1990, Akers visited Lucente in Japan, and told Lucente that he (Lucente) had "some serious problems with other members of the top management team." (Lucente Dep. at 109).

During a trip back to the United States in November 1990, Lucente met with Akers again, at which time Akers told Lucente that he had lost confidence in him and that Lucente was losing support from other members of the corporate management board. (*Id.*) During that same conversation, Akers told Lucente to start planning his return to the United States from Japan. According to Lucente, Akers told him that he would not have a job for Lucente and he encouraged Lucente to consider employment elsewhere. (Lucente Dep. at 110, 121). As Lucente recalled the conversation, he was told by Akers that he had no future left at IBM. (*Id.* at 121–125). Akers asked him if he had considered anything outside IBM. Lucente told him that he had been made an offer from Carnegie–Mellon University and that he had also held some conversations with Paul Stern, the CEO of Northern Telecom.[3] Akers discouraged Lucente from the academic job, but indicated that perhaps something could be worked out whereby IBM would not consider Northern Telecom to be a competitor. (*Id.* at 111.)

John Aker's deposition testimony substantially confirms Lucente's recollection of the conversations:

Q. What do you recall discussing with Mr. Lucente about what he would do for IBM after you brought him back from Tokyo?

A. ... and I said, well, *I don't think you are going to get a job that's at the same level that you've been working in terms of responsibilities, maybe something less....*

Q. Did you ever formulate more specifically in your mind what position you had available for Mr. Lucente which was of a lesser responsibility?

A. No.

Q. Did you ever tell Mr. Lucente what options you were considering in terms of a position for him after Asia–Pacific of lesser responsibility?

A. Not in the specific.... *I personally felt that it would be better for him to leave* because he had a shot at being successful to the degree he wanted to be with a new repotting, if you will....

Q. Tell me what you can recall about your discussions with Mr. Lucente about the kinds of jobs he might have at IBM should he choose to stay with the company.

A. Well, I don't remember the specifics and we did not get into the specifics....

Q. But certainly a position of lesser significance in the company in your view and in Mr. Lucente's view than the positions he had previously been occupying?

A. That's correct.

Q. Do you recall any specifics about which of those types of staff jobs you discussed with Mr. Lucente as being possible—

A. I did not. I don't think I did.

Q. You didn't discuss specific staffs where he might be employed?

A. No.

Q. *Did you conclude that is was in IBM's best interest that Mr. Lu-*

---

3. Defendant attempts to make an issue put of the fact that Lucente's first contact with Northern Telecom occurred in Summer of 1990, well before these conversations with Akers. It is clear from the record, however, that Lucente was contacted by a headhunter—a commonplace occurrence in the corporate world—who had suggested an exploratory meeting with Paul Stern. There is no indication in the record that Lucente planned to leave IBM until after his discussions with Akers in the Fall of 1990. (Lucente Dep. at 119).

cente seek employment outside the company?

A. I think I did. I thought it was in IBM's best interest.

Q. Did you communicate that to Mr. Lucente?

A. Yes, I did. I am sure I did.

(Akers Dep. at 87–96) (emphasis added).

In the first week of December 1990, Lucente returned again to the U.S. to discuss his operating plan for Asia and the outlook for the Asia division in the coming year. Akers told Lucente—in a group meeting—that his plan was unacceptable. Later that evening, Akers called Lucente and told him that he would be sending Ned Lautenbach to Japan to help with the plan and the Asia operation as an assistant group executive. (*Id.* at 112–113.) Akers later testified that, at the time he was encouraging Lucente to leave IBM, he was intending to replace Lucente with Lautenbach. (Akers Dep. at 18.) Lucente took this—quite correctly as it turned out—as the final signal that Akers wanted him out of IBM. Between that date and the end of the 1990, Lucente held several meetings with Paul Stern and other Northern Telecom executives. He reached an agreement with Northern Telecom the third week of December.

Shortly thereafter, Lucente met with Akers for the last time. He told Akers of his offer from Northern Telecom, and Akers agreed that IBM would announce Lucente's departure from IBM in a way that preserved some dignity. (*Id.* at 114.) The terms of his separation from IBM were discussed, but Lucente told Akers he would be more comfortable if Lawrence Gutstein, IBM's Director of Officer Services,[4] handled the details of the terms. Lucente joined Northern Telecom and IBM paid him substantial severance; IBM did not cancel any of the stock options or restricted stock to which Lucente was entitled as part of his long-term compensation package.

Putting the best possible spin for IBM on Akers' testimony, he told Lucente that IBM might have "something less" than Lucente's then-level of responsibilities for him when he returned from Japan. (Akers Dep. at 87). Under *SIFCO*, the fact that Lucente could expect such a demotion bars invocation of the employee choice doctrine. To overcome Plaintiff's motion for summary judgment, IBM must make a showing that it was willing to maintain Lucente at the same or a comparable level of responsibility and compensation. I find no evidence in the record to indicate that IBM was willing to continue to employ Lucente at the same level of responsibility and compensation when he left for Northern Telecom in 1991. On the contrary, the only fair inference a reasonable jury can draw from the record before me is that Akers asked Lucente to leave. That he expressed that desire somewhat euphemistically (deploying language with which anyone active at the highest levels of corporate America is familiar) is irrelevant, as is the fact that Lucente was allowed to "retire." Akers testified that "[t]he practice of the IBM Company is not to terminate people," (Akers Dep. at 125), and during Akers' time as CEO, not one high-level IBM executive was "terminated," but several took "early retirement." (*Id.* at 111–112). Nonetheless, IBM wanted Lucente gone. It therefore may not invoke the employee choice doctrine.

This conclusion is further supported by the undisputed fact that, despite acknowledging that Northern Telecom is a direct competitor of IBM (Akers Dep. at 101–102)[5], *IBM chose to release Lucente from the restraints of the noncompetition clauses at issue here in order to facilitate his departure from IBM.* IBM's contention—

---

4. In this position, Gutstein was responsible for discussing with departing executives the details of their retirement packages.

5. When asked if the ROLM division of IBM and Northern Telecom were in the same business, Akers responded "I believe it was. Or close to it." (Akers Dep. at 101–102.)

that Lucente was presented the choice between remaining at IBM and retaining his stock options or leaving with the knowledge that working for a competitor would lead to forfeiture—does not comport with the facts. Lucente was explicitly told that, when he left IBM, he could go to Northern Telecom—an IBM competitor—without giving up his stocks and options. This is not the "choice" contemplated by the doctrine.

The question, then, becomes, whether IBM gave Plaintiff a "choice" in April 1993, when he faced forfeiture of his benefits for joining Digital. The answer is no.

On this point, *Murphy v. Gutfreund*, 583 F.Supp. 957 (S.D.N.Y.1984), is instructive. Vincent Murphy had been a partner at Solomon Brothers. He then left to accept a position at Merrill Lynch. Prior to moving to Merrill Lynch, Murphy had asked John Gutfreund, the managing partner of Salomon, whether Salomon would deem Murphy's work at Merrill Lynch to be competitive. Gutfreund responded that "the Executive Committee would raise no objections to his association with Merrill Lynch because the Committee believed that he would not be competing with Salomon." *Id.* at 960. Later, however, after Murphy had already accepted his position at Merrill Lynch, Salomon changed its mind and decided that Murphy was competing. Salomon then attempted to use this supposed competition as a basis to deny Murphy an annual annuity paid to all former Salomon partners. *Id.* Murphy challenged Salomon's decision. Salomon attempted to defend on the basis of the employee choice doctrine.

Judge Lasker of this Court rejected Solomon's argument, finding that Murphy had been denied any meaningful choice, because he had already detrimentally relied on Gutfreund's representation and accepted a position at Merrill Lynch before the moment came for him to make his "choice":

> The 'employee choice' doctrine can only be fairly applied when the employee may choose between accepting benefits and working for a competitor at a time before the employee has made a commitment to either option. It follows that it does not apply, here, where the employee has been told by the former employer that his new position was not in competition with that employer who later offers the employee the choice of quitting the new position or accepting a proffered annuity.

583 F.Supp. at 965.

The only difference between *Murphy* and the case at bar is that IBM did not change its mind about Lucente's joining Northern Telecom. Rather, IBM decided to cancel the stocks and options only after learning of Lucente's move to Digital, a different (and presumably more threatening) competitor. But that is a distinction without a difference. There is no evidence that IBM, learning of Lucente's planned move came to him and offered him employment. Indeed, it is undisputed that IBM *did not intend to rehire Lucente in 1993.* (*See* Evangelista Dep. at 65–66; Burdick Dep. at 150.)[6] Thus, the employee choice does not apply to that decision either.

**6.** Akers testified:

> Q. [D]uring the time when you were still CEO of IBM, did you have a job for Mr. Lucente at IBM that you wanted to hire him and place him in?
> A. You are asking me if I had a job for Lucente in 1993? And that I wished to hire him?
> Q. Yes.
> A. No.
> Q. In 1991 you believed that it was in the best interest of IBM for Mr. Lucente to take early retirement from the company. In 1993, did you continue to be of the opinion that is was in IBM's best interest that Mr. Lucente stay in retirement from IBM as opposed to active employment.
> A. It never crossed my mind.
> Q. It never crossed your mind that the company would have a desire to hire him back in to active employment.
> A. No.

(Akers Dep. at 142–143).

Because IBM has failed to put on any evidence that it was willing to continue to employ Lucente—either in 1991 or 1993—I conclude that the employee doctrine does not apply to this case.

C. *The Non–Compete Agreements are Unenforceable as a Matter of Law*

Where the employee choice doctrine is not implicated, the Court must examine the reasonableness of the noncompete agreements.

■■■ The forfeiture for competition provision in the 1982 Plan reads in pertinent part:

> The employee shall not render services for any organization or engage directly in any business which, in the opinion of the Board, competes with, or is in conflict with, the interest of, the Company.

(Bursor Decl. at Exh. 2). The 1989 Plan states:

> A participant shall not render services for any organization or engage directly or indirectly in any business which, in the judgment of the Chief Executive Officer of the Company or other senior officer designated by the Committee is or becomes competitive with the Company, or which organization of business, or the rendering of services to such organization of business, is or becomes otherwise prejudicial to or in conflict with the interest of the Company.

(*Id.* at Exh. 1). Each of these provisions places a prohibition on competitive employment that is unlimited in time, place and scope. They bar plan participants from accepting employment at competing companies at any time, without forfeiting their accrued and vested benefits. Under New York law, such an agreement is unreasonable on its face.

■■■ Under New York law, noncompetition agreements involving employees are strongly disfavored on public policy grounds:

> [O]ur economy is premised on the competition engendered by the uninhibited flow of services, talent and ideas. Therefore, no restriction should fetter an employee's right to apply to his own best advantage the skills and knowledge acquired by the overall experience of his previous employment. This includes those techniques which are but 'skillful variations of general processes known to the particular trade.'

*Reed, Roberts Associates, Inc. v. Strauman,* 40 N.Y.2d 303, 307, 386 N.Y.S.2d 677, 680, 353 N.E.2d 590 (1976).

■■■ Courts apply a reasonableness standard, under which a noncompetition agreement will be upheld only if it (1) is not greater than required for the protection of the legitimate interests of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public. *See Bdo Seidman v. Hirshberg,* 93 N.Y.2d 382, 388–89, 690 N.Y.S.2d 854, 857, 712 N.E.2d 1220 (1999). The failure of any of these three prongs renders the covenant invalid. *Id.* The first element requires that the restriction be "reasonable in time and area." *Id.* But before examining the "reasonableness" of the time and scope restriction, courts examine whether the employer has any legitimate interests to protect:

> Only after determining that a restrictive covenant would serve to protect against such 'unfair and illegal' conduct and not merely to insulate the employer from competition, does the reasonableness of the covenant in terms of it 'time, space or scope,' or the oppressiveness of its operation become an issue.

*American Institute of Chemical Engineers v. Reber–Friel Co.,* 682 F.2d 382, 387 (2d Cir.1982) (quoting *American Broadcasting Companies, Inc. v. Wolf,* 52 N.Y.2d 394, 438 N.Y.S.2d 482, 420 N.E.2d 363 (1981)). Courts will enforce employment restrictions "only to the extent necessary to protect the employer from unfair competition which stems from the employee's use or disclosure of trade secrets or confidential

customer lists," or "confidential customer information." *Id.*

Plaintiff argues that IBM has failed to show any legitimate interest that was served by its forfeiture decision made more than two years after Lucente left IBM. In response, IBM reiterates that it has the interest of retaining employees and promoting loyalty. However, when questioned in their depositions for this case, IBM executives could come up with no specific response to the question of what particular information, trade secrets, or proprietary rights were being protected by enforcing a noncompete against Lucente more than two years after he left IBM. The only thing they suggested was that purported competitors should not be allowed to benefit from Lucente's general expertise. For example, Akers testified that he did not know what information Lucente had when he left in 1991 (Akers Dep. at 46), and that he did not know if Lucente had any strategic, sensitive information regarding IBM in April of 1993 when the forfeiture was declared. (*Id.* at 47.) (*See also* Stone Dep. at 181–83) (noting that the skills valuable to Digital were Lucente's "management, executive and marketing skills"); (Evangelista Dep. at 127–29).

IBM has not identified any specific or confidential or proprietary information that Lucente had in 1993 that could have been unlawfully used in his employment at Digital. Lucente's innate management skills and general know-how are exactly the kind of information that cannot be restricted through a covenant not to compete. *See Paramount Pad Co., v. Baumrind,* 4 N.Y.2d 393, 397, 175 N.Y.S.2d 809, 151 N.E.2d 609 (1958); *Reed Roberts Associates, Inc. v. Strauman,* 40 N.Y.2d 303, 309, 386 N.Y.S.2d 677, 680–81, 353 N.E.2d 590. Further, any specific information about IBM and the computer industry would not warrant ongoing protection of a noncompete that is unrestricted in time. And, the only conclusion one can reach from the fact that IBM blessed Lucente's move to Northern Telecom is that they— were not concerned about Lucente's taking the marketing and management skills he had acquired during his 30 years with IBM to a competitor. (*See* Burdick Dep. at 100.) (Lucente had "current knowledge about the family jewels [in 1991] when he left [IBM].") Indeed, Akers hoped that Lucente would flourish through a "repotting." (Akers Dep. at 87.)

Plaintiff also notes that, at the time of his departure from IBM in 1991, he was subject to a confidentiality agreement that covered trade secrets and confidential information. This agreement was totally separate from any noncompetition provisions relating to his restricted stock and stock options. (*See* Termination Letter dated Feb. 21, 1991, and Letter dated Feb. 28, 1991, attached to Pl's Mem. at Exhs. 7 & 8.) The existence of these separate confidentiality agreements demonstrates that the enforcement of the noncompete would not have been necessary to insure that Lucente did not pass trade secrets and confidential information to Digital.

IBM is correct that the type of benefits subject to forfeiture in these incentive award programs receives less scrutiny from courts than the forfeiture of ERISA or other retirement benefits. For example, in *York v. Actmedia, Inc.,* 88 Civ. 8763, 1990 WL 41760, (Mar. 30, 1990 S.D.N.Y.), Judge Griesa held that a forfeiture of stock options was valid where the former employee had signed an agreement not to compete for two years following his departure. In contrast, after *Murphy,* it is unlikely that any noncompete conditions placed on an employee's receipt of retirement benefits would be declared per se unreasonable. However, "golden handcuff" awards, like those at issue here, are the kind of icing on the cake that encourages executives to remain loyal and stay at the company by giving them long-term opportunities for significant wealth accumulation. In light of a company's desire to retain and reward employees, such conditions may be found to be reasonable.

But they are not reasonable here, precisely because IBM unlocked the handcuffs and released Lucente. Once it had removed those handcuffs in 1991, IBM could no longer argue that the stated purpose of its plans—"to retain" and "reward" selected key employees—justified the restriction.

For these reasons, I hold the noncompetition clauses in the 1982 and 1989 Plans, and any predecessor plans affecting Lucente's incentive pay, are unreasonable as a matter of law. As a result, IBM breached its obligation to Lucente when it cancelled his restricted stock and stock option awards made under the terms of those plans.

Having determined the clauses to be unreasonable, it is unnecessary to address Plaintiff's additional argument that IBM violated Plan procedures when it cancelled his benefits. The only issue remaining on the breach of contract claim is the measure of damages to which Lucente is entitled. Unfortunately, it is not an uncomplicated one.

### III

### IBM'S COUNTERCLAIM

█ Plaintiff moves for summary judgment dismissing IBM's counterclaim for the 1991 severance payment on the grounds that (1) the text of his severance letter does not place any conditions on the severance payment, (2) even if the noncompete provision did apply to the severance payment, it is unreasonable as a matter of law. Having already determined that the employee choice doctrine does not apply to the facts of this case, I conclude that Plaintiff is correct and dismiss the counterclaim.

On February 21, 1991, IBM made a severance payment to Lucente in the amount $675,000. This payment was referred to in a stand-alone paragraph in the letter dated February 21, 1991, signed by Walter E. Burdick, Senior Vice President, Personnel, as follows:

> In connection with your retirement from IBM, we will pay you a special payment of $675,000 (less all applicable FIT and FICA, state and local taxes) in March 1991.

(Bursor Decl. at Exh. 3.) Burdick went on to state in the next paragraph that the severance payment was made "exclusive of your entitlement to income from the IBM Retirement Plan or any other benefits to which you are entitled as an employee electing early retirement in accordance with IBM benefit plans." (*Id.*)

The issue of competing employment was made in a separate paragraph:

> Following your retirement, other than your employment with Northern Telecom, which we deem not to be competitive or in conflict with the best interests of IBM *based on the facts of your situation,* you shall not engage in any activity as an employee, consultant, or director, personally or with any firm or organization, that is or becomes, in IBM's sole opinion, a competitor of IBM or its subsidiaries, or is otherwise prejudicial to or conflicts with the interests of IBM. This agreement is in addition to the provisions of the IBM Employee Confidential Information and Invention Agreement (and/or the IBM Agreement Regarding Confidential Information and Intellectual Property). Your outstanding stock options and restricted stock continue to be subject to the Termination of Employment sections of the IBM Stock Options Plans, the 1989 Long–Term Performance Plan, and the IBM Variable Compensation Plan.

(*Id.*) (emphasis added). Lucente signed this letter to indicate his agreement with its terms.

In 1993, at the time Lucente joined Digital, IBM informed Lucente that it was terminating his restricted stock and stock options packages. It said nothing to Lucente about forfeiture of the severance payment. In fact, this counterclaim arose only in the context of this litigation, and appears to have been made to retaliate

against Lucente for suing IBM on the stock package. The gravamen of the counterclaim is that, by taking up employment with Digital, Lucente violated the terms of the severance payment. I find the counterclaim entirely without merit.

 The Burdick letter does not explicitly condition the severance payment on future non-competition, a point this Court made in its earlier opinion. The paragraph awarding Lucente severance does not say anything about forfeiture for competition. The noncompetition language in the letter appears in a separate paragraph, which makes no reference whatsoever to the severance payment. The agreement seems clear enough on its face—it attempted to reinforce IBM's unreasonable and unenforceable non-competition clause, but set out no explicit penalty therefor. And, to the extent the letter might be found to be ambiguous on its face, it must be construed against the drafter, IBM. See U.S. v. Manshul Constr. Corp., 940 F.Supp. 492, 499 (E.D.N.Y.1996). I therefore conclude that the separate paragraph discussing noncompetition placed no condition on the payment of severance.

If parol evidence were needed to help clarify matters, that evidence would support dismissal of the counterclaim. Burdick testified that he did not tell Lucente that the severance payment was subject to a non-compete. (Burdick Dep. at 120.) Nor could Lawrence Gutstein, who met with Lucente in January 1991, to talk about his retirement decisions, recall telling Lucente that his retention of the severance payment was subject to future non-competition. (Gutstein Dep. at 101–03.) In fact, both Burdick and Gutstein testified that the only person who was authorized to set the terms of the severance payment was John Akers. (Burdick Dep. at 8, 120; Gutstein Dep. at 146.) And Akers testified that he did not tell Lucente that IBM's severance payment was subject to any noncompetition restrictions. (Akers Dep. at 122.) Akers further testified that he did not tell Burdick that the payment was subject to any kind of noncompetition restrictions:

Q. ... You didn't tell Lucente that should he in the future engage in competitive employment, that that $675,000 might be sought back from IBM, did you?

A. I did not.

Q. You didn't express that to him as being a condition of the payment of the $675,000 did you?

A. I did not.

Q. And you didn't instruct anybody else at IBM to tell him that a condition of the $675,000 payment was that he refrain from any future competitive employment?

A. Not that I recall.

(Akers Dep. at 123). This testimony is completely consistent with Akers' testimony that IBM would make sure that Lucente's leaving IBM and joining Northern Telecom would be viewed as noncompetitive. It is also consistent with the plain language of the letter. Only IBM's position in its papers before this Court—that the Burdick letter expressly conditions the severance payment on continuing noncompetition—is inconsistent with both the testimony of its former CEO and the text of the letter.

Finally, even if the noncompetition language in the February 21, 1991 letter were drafted so as to apply conditions on the payment of severance, such conditions would, as a matter of law, be unenforceable. The noncompetition paragraph in the letter is unreasonable on its face for the same reasons the noncompete clauses in Lucente's long-term compensation plans are unreasonable. The language here goes even further than that—it attempts to create an absolute and total restraint on competition. The period "following your retirement" is not limited in scope or duration, as required under New York law. Further, as discussed above, IBM's attempt to recover the severance payment years after Lucente left IBM belies IBM's

interest in protecting itself from any potential unfair or illegal conduct on Lucente's part. He was already constrained by separate agreement concerning trade secrets. And by the time he joined Digital, he apparently had no information that would warrant the protection of a noncompete (or at least IBM has not identified any such information).

Plaintiff's motion for summary judgment on the counterclaim is granted, and the counterclaim is dismissed.[7]

## IV

## DAMAGES

Plaintiff asks that the Court order specific performance under the compensation agreements. He argues that the best way to compensate him for the loss he suffered as a result of IBM's breach is to restore the restricted stock (adjusted for stock splits and dividends) and stock options (with exercise dates adjusted accordingly) that he possessed at the time of forfeiture. In the alternative, Plaintiff requests that the Court award money damages in an amount equal to the maximum potential gains he would have realized from sales of the stock and options between the date of their cancellation and today. IBM opposes specific performance, and instead argues that money damages are the only remedy available to Plaintiff. IBM suggests that the proper measure of damages is the market value of the options and restricted shares on the date of their forfeiture. In the alternative, IBM moves in limine to exclude Plaintiff's damages expert and the report on which he based his estimate of damages.

### A. *Specific Performance*

■■■ Specific performance is a species of equitable relief. *See* Restatement (Second) of Contracts § 359 (1981). "Before specific performance may be ordered, remedies at law first should be determined

to be incomplete and inadequate to accomplish substantial justice." *Leasco Corp. v. Taussig*, 473 F.2d 777, 786 (2d Cir.1972) (citing *Erie R. Co. v. City of Buffalo*, 180 N.Y. 192, 73 N.E. 26 (1904); Williston on Contracts § 1418 (3d ed.1968)). That a remedy at law may exist, however, does not in itself preclude equitable relief. *Id.* If a court finds that substantial justice cannot be achieved through the award of money damages, specific performance may be awarded. *Id.* (citing *Dailey v. City of New York*, 170 App.Div. 267, 274, 156 N.Y.S. 124 (1st Dept.1915)). In considering whether to award specific performance, a court should consider all the circumstances of the case. *Id.* at 785.

■■■ It would not "do equity" to order specific performance of the options with reformed exercise periods, since the relevant periods have long since expired and circumstances today are much more favorable to Plaintiff that they were six or five years ago. Any award of shares of stock today would likewise prove inequitable. Because substantial justice can best be achieved through the award of money damages, I deny Plaintiff's request for specific performance.

### B. *Money Damages*

#### (1) *General Principles*

Plaintiff argues that, if the Court deems money damages adequate, the amount of damages should be determined by a jury. The parties do not dispute the number of shares or options to which Lucente would have been entitled but for the cancellation. However, the parties have radically different ideas about what economic methodology should be employed to measure the value of Plaintiff's injury.

■■■ "Although calculation of the amount of damages is a factual determination, *the formula used in making that calculation* is a question of law." *Vermont*

7. Having dismissed the counterclaim on the merits of the agreement, I need not address

IBM's motion to exclude Plaintiff's statute of limitations, laches and waiver defenses.

*Microsystems, Inc. v. Autodesk, Inc.,* 138 F.3d 449, 452 (2d Cir.1998) (citing *United States ex rel. N. Maltese and Sons, Inc. v. Juno Constr. Corp.,* 759 F.2d 253, 255 (2d Cir.1985)) (emphasis added). *See also Dana v. Fiedler,* 12 N.Y. 40, 50 (1854); *McAfee v. Dix,* 101 A.D. 69, 75–77, 91 N.Y.S. 464 (1905). The method by which the value of the shares and options should be measured is an issue that must be resolved by the Court.

▆ The general purpose of damages awards is to place the injured party in the position in which she would have been had the contract not been breached. *See Indu Craft, Inc. v. Bank of Baroda,* 47 F.3d 490, 495 (2d Cir.1995); *Brushton–Moira Cent. School Dist. v. Fred H. Thomas Assocs., P.C.,* 91 N.Y.2d 256, 261, 669 N.Y.S.2d 520, 522, 692 N.E.2d 551 (1998) ("[d]amages are intended to return the parties to the point at which the breach arose.") "It is a fundamental proposition of contract law, including that of New York, that the loss caused by a breach is determined at the time of breach." *Sharma v. Skaarup Ship Management Corp.,* 916 F.2d 820, 825 (2d Cir.1990). "The proper measure of damages for breach of contract is determined by the loss sustained or gain prevented at the time and place of breach." *Simon v. Electrospace Corp.,* 28 N.Y.2d 136, 145, 320 N.Y.S.2d 225, 232, 269 N.E.2d 21 (1971). *See also Teachers Ins. & Annuity Ass'n of Am. v. Butler,* 626 F.Supp. 1229, 1236 n. 23 (S.D.N.Y.1986) ("Contract damages are measured at the time of breach.")

The parties do not dispute that the date of breach was April 15, 1993, the date IBM cancelled Lucente's restricted stock and stock options, and that damages should be calculated in accordance with Plaintiff's loss on that date. (Complaint ¶ 34). Further, Plaintiff and Defendant agree that Plaintiff's "loss" was the denial of the opportunity to realize future gains (or losses) on the stocks and options. But they differ sharply on how that lost economic opportunity should be measured.

### (2) *Plaintiff's Proposed Measure of Damages*

*Restricted Stock:* Restricted stock is stock that IBM awards certain employees and holds in escrow for a period of time, after which it is released to the employee without restrictions. (1989 Plan ¶ 8; 1982 Plan ¶ 7; Escrow and Deposit Agreements). Lucente was granted 12,283 shares of IBM restricted stock. Under the terms of the original agreement, this restricted stock was to be released on the later of January 3, 2000 or the first day of Lucente's retirement from IBM. Since he left the company in 1991, he was entitled to receive the stock free of restriction on January 3, 2000, absent any modification of the original stock terms. Plaintiff calculates damages for forfeiture of the restricted stock as the highest value the stock reached between January 3, 2000, and April 6, 2000, the date Plaintiff filed its motion for summary judgment. (Vaught Report (Bursor Decl.Exh. 52) at 1.) He places this value at $6,129,217, for 49,132 shares (adjusted for splits and dividends).

*Options:* IBM also issues "call" options to employees participating in the incentive award plans. A "call" option is the right to purchase, during a specified period of time, a specified number of shares of IBM capital stock at a fixed price, which is not less than—and frequently significantly higher than—the average of the high and low price of IBM capital stock on the date of grant.[8] (1989 Plan ¶ 7(a) (Bursor Decl. Ex. 1)). Prior to the cancellation of his incentive awards, Lucente held 126, 739

---

**8.** In order to exercise a "call" option, the owner of the option tenders the strike price, and receives the shares of stock in return. Thus, when the market price exceeds the strike price, the value of the option will be at least equal to the difference between the strike price and the market price. *See* Gordon Gemmill, Options Pricing 3 (McGraw

Hill 1993). A call can be explained through the following example:

> If the market price of a stock is $10 and the strike price is $8, the holder of the option could elect to exercise the option, tender the $8 in exchange for a share of the stock, and sell the share of stock on the open market for $10. The certain profit in this

unexercised IBM stock options. (Letter from W. Burdick to Lucente, Mar. 1, 1991 (Bursor Decl.Ex. 4).) These options had exercise—or "strike"—prices ranging from $96.69 to $159.50, and were subject to expire on a series of dates, ranging from May 23, 1993 to January 28, 2001. (*Id.*) On April 15, 1993, all of these options were "under water;" that is, their strike prices exceeded the market price for IBM shares on that date. Plaintiff seeks damages on the assumption that the benefit of the bargain entitles him the amount he would have made by exercising the options at the exact moment after April 15, 1993 and prior to the expiration date of each options agreement when IBM stock reached its highest value. (*See* Vaught Report, Feb. 22, 2000 at 2; Joint Pretrial Order, Pl. Contentions ¶ 20.)[9] Applying this assumption to all the options awards, Plaintiff estimates his total damages as $31,950,218. (Pls.Exh. 11 (Vaught Report at Exh. 2).)

### (3) *Defendant's Proposed Measure of Damages*

*General Objection:* IBM protests that Plaintiff's proposal rewards Lucente with a windfall that benefits from hindsight and does not represent the actual loss sustained or gain prevented as a result of the cancellation. Insofar as the restricted stock is concerned, IBM contends that Plaintiff's calculation is based on a false premise—that the restricted stock would not have been released out of escrow until January 3, 2000. Due to a change in IBM's policies in 1993, if Lucente's stock had not been cancelled in 1993, he would have received the shares out of escrow in November 1993. IBM contends, in any event, that the proper measure of damages is the value of the Lucente's restricted stock holdings on April 15, 1993, discounted 18.7% for lack of marketability (because Lucente was restricted from trading them), which totals $488,719. (Bursor Decl.Exh. 54 (James Report at 10).)

*Options:* IBM urges that the Court adopt one of two widely accepted and widely used finance models for valuing stock options: (1) the Black–Scholes pricing model or (2) the Binomial Pricing model.[10] Both these models compute the value of an option based on six inputs: (1) the

---

situation would be $2—the $10 received from the open market sale of the stock less the $8 paid to exercise the option. If the market price is less that the strike price, exercising the call option would result in a loss. However, because the holder of a call option has the right to exercise the option, but is not obligated to do so, the holder will simply elect not to exercise the option whenever the market price is less than the strike price. Thus, the value of the option can never be less than zero.
*Regier v. Rhone–Poulenc Rorer, Inc.*, Civ. A. No. 9304821, 1995 WL 395948 (E.D.Pa. June 30, 1995). IBM issued options to Lucente with strike prices above the market value of IBM shares on the date of grant.

9. As one example, Lucente was awarded a stock option grant on January 30, 1990 with an expiration date of January 30, 2000. (All of his options grants had ten-year expiration dates.) (Bursor Decl. Exh. 16.) The exercise or strike price for this option was $96.69 per share. The price of IBM stock remained below the strike price for this option until April 1995. Thereafter, however, the price of IBM stock continued to rise until it significantly

exceeded the strike price for that particular option. (IBM Weekly Unadjusted an Adjusted Prices, 4/15/93 to 3/31/00 (Bursor Decl.Exhs. 64–65)). Lucente's damages calculation assumes that, absent IBM's cancellation of the option grants, he would have waited to exercise those options for more than four years after they first became profitable. (Vaught Report (Bursor Decl.Ex. 52.)). On July 13, 1999, IBM stock reached its highest price during the period from April 15, 1993 until January 30, 2000 (the expiration date). According to Lucente's calculations, this particular option should thus be valued at $12,189,290—the profit he would have made if he had held the option and exercised at the exact moment (July 13, 1999) that IBM shares traded at their highest price.

10. *See* F. Black and M. Scholes, "The Pricing of Options and Corporate Liabilities," 81 *Jour. of Pol. Econ.* 637–659 (1972). *See also* J.C. Cox, S.A. Ross, and M. Rubinstein, "Option Pricing: A Simplified Approach," 7 *Jour. of Fin. Econ.* 229–263 (1979).

stock price of the underlying stock at the date of the valuation of the options; (2) the exercise price; (3) the time of expiration (4) the annual risk-free rate; (5) the annualized volatility of the underlying stock; and (6) the annual dividend yield of the underlying stock. What both these models have in common is that the value of a stock option—even one that is "under water"—is always positive until the date the option expires. This is true because, no matter how far "under water" the option is, in a open market, a price can be placed on the chance that the shares will rise above the strike price at some point prior to the expiration date. Applying the models to Lucente's option awards on April 15, 1993 yields only marginally different awards: (1) under a Black–Scholes valuation, $320,-693; or (2) under the binomial pricing model, $329,953.

#### (4) *New York Law on the Proper Measure of Damages*

In traditional breach of contract cases, New York courts have rejected adopting the kind of hindsight-based measure of damages Plaintiff proposes. This seems fair. To award damages by valuing the assets at the time of trial constitutes "a two-edged sword ... courts would have to diminish damage awards where the value of the item decreased or where losses were encountered subsequent to the breach as well as enhance them where conditions improve." *Sharma v. Skaarup Ship Management, Corp.,* 916 F.2d 820, 826 (2d Cir. 1990). The Second Circuit noted in *Sharma:*

> "New York courts have expressly refused to adopt this 'wait and see' theory of damages. They have explicitly rejected the use of subsequent changes in value or profits where they would increase an award ... and where they would decrease the award."

*Id.* at 826 (citations omitted).

New York courts have applied this rule to breach of contract for real estate, *see Webster v. Di Trapano,* 114 A.D.2d 698,

699, 494 N.Y.S.2d 550, 551 (App.Div.3d Dep't 1985) (contract price of real estate $63,500, value at time of breach $57,500, sold eleven months later for $55,000, damage award should have been $6,000), to fluctuations in currency exchange rates subsequent to breach, *see Parker v. Hoppe,* 257 N.Y. 333, 178 N.E. 550 (1931), and to damages arising from breach of an agreement to purchase securities, *see Aroneck v. Atkin,* 90 A.D.2d 966, 967, 456 N.Y.S.2d 558, 559 (4th Dep't 1982).

*Aroneck* is instructive: the defendants had agreed to purchase certain shares in a corporation from plaintiffs. The trial court found defendants liable for breaching the contract and computed the sellers' damages for the buyers' breach of the contract to purchase by determining the difference between the agreed price of the shares and the fair market value of such shares at the time of breach. The appellate division affirmed the trial court's calculation of damages, specifically holding that the trial court "correctly rejected the valuation theories advanced by [the buyers'] experts to the effect that the value should be based on actual economic conditions and performance of the [business in year's subsequent to the breach] rather than on what knowledgeable investors anticipated the future conditions and performance would be at the time of breach." 90 A.D.2d at 967, 456 N.Y.S.2d 558 (citing 13 N.Y.Jur., Damages, § 43, p. 479.) *See also Simon v. Electrospace,* 28 N.Y.2d 136, 320 N.Y.S.2d 225, 269 N.E.2d 21 (1971) (holding that where payment of a finder's fee was to be made in the form of shares of the merging corporation, damages were determined by the value of the shares at the time of breach); *Van Gemert v. Boeing,* 553 F.2d 812 (2d Cir.1977).

While attempting to preserve the rule that damages are measured at breach, New York courts have recognized that valuing the assets on the date of breach—the timing of which can be controlled by the person repudiating the agreement—does not always lead to an equitable result or

give plaintiff's the benefit of their bargains. Courts have sought out an intermediate ground in cases where the defendant's breach or tortious conduct deprived plaintiff of the opportunity to sell securities at an optimal price. In *Schultz v. Commodity Futures Trading Comm'n*, 716 F.2d 136 (2d Cir.1983), an investor brought a complaint before the CFTC after a commodities broker liquidated his futures contracts without his authorization. The CFTC denied the petitioner his request for damages in the amount of profit he would have made on the contracts on the ground that his "failure to attempt to mitigate his damages by reentering the market, or to prove that it was financially or otherwise unreasonable for him to do so, precluded recovery for potential lost profits." *Id.* at 138. The Schultz Court remanded the case to the CFTC for determination of damages, holding that "it is necessary when assessing damages in this kind of case to include profits possibly lost as a result of the wrongful conduct." *Schultz* at 140.

In so holding, the Second Circuit relied on *Galigher v. Jones*, 129 U.S. 193, 9 S.Ct. 335, 32 L.Ed. 658, (1889), in which the Supreme Court held:

> the measure of damages in stock transactions of this kind is *the highest intermediate value reached by the stock between the time of the wrongful act complained of and a reasonable time thereafter*, to be allowed to the party injured to place himself in the position he would have been in had not his rights been violated.

*Id.* at 200, 9 S.Ct. 335. (emphasis added). This departure from the general rule was based on the Galigher Court's conclusion

that where the conversion involves marketable securities, *the actual loss to the injured party is the loss associated with being forced to sell at an unfavorable time and being denied the opportunity to sell at a favorable time. Id.* (emphasis added).

The Galigher Court did not define a "reasonable time": "What constitutes a reasonable period between the act complained of and the time when reentry into the market would be both warranted and possible will vary from case to case, but the injured party is not actually required to reenter the market in order to determine when he might have done so." *Schultz* at 140. The Court did not require *actual* reentry into the market to measure the damages, because to require an injured party to reenter a volatile or disfavorable market (and risk further losses) would frustrate the purpose of a rule that seeks to make the injured party whole. *Id.*

The Second Circuit in *Schultz* thus carved the rule:

> [T]he measure for damages for wrongful conversion of stock is either (1) its value at the time of conversion or (2) its highest intermediate value between notice of the conversion and a reasonable time thereafter during which the stock could have been replaced had that been desired, whichever of (1) or (2) is higher. *See In re Salmon Weed & Co.*, at 342.

*Id.* at 141.

Other courts "have essentially followed Galigher's reasoning in measuring damages where stock or 'properties of like character' were converted, not delivered according to contractual or other legal obligation, or otherwise improperly manipulated." *Id.*[11] It would thus appear appro-

---

11. *See, e.g., Chipser v. Kohlmeyer & Co.*, 600 F.2d 1061, 1067–68 (5th Cir.1979) (due to investor's desire not to reenter the market after his contracts were liquidated, damages were assessed as the difference between value at time of liquidation and value at time he decided to stay out of market); *Mitchell v. Gulf Sulphur Co.*, 446 F.2d 90, 104–106 (10th Cir.) (where investors sold stock in reliance on misleading press release, measure of damages is highest price of stock during a reasonable period (between 9 and 17 days) after investors learned of wrong and should have reinvested had they desired to do to), *cert. denied*, 404 U.S. 1004, 92 S.Ct. 564, 30 L.Ed.2d 558 (1971); *Nephi Processing Plant, Inc. v. Talbott*, 247 F.2d 771, 774 (10th Cir. 1957) (turkeys sold at wrong time in breach of

priate to apply the *Schultz* methodology to a breach of contract case, such as the case at bar, where the defendant's breach deprives plaintiff of control over when to optimize his profits.

■ IBM argues that, upon learning of IBM's cancellation of his stock options and restricted stock, Lucente could have avoided most of the loss (i.e. the gains, viewed in hindsight, on the shares and options) he now seeks by buying equivalent securities in April 1993. (*See* James Report (Bursor Decl.Exh. 54) at 12, James Report (Bursor Decl.Exh. 31) at 134–138, 235.) *See also Simon,* 28 N.Y.2d at 146, 320 N.Y.S.2d at 233, 269 N.E.2d 21 ("If plaintiff were anxious to own the shares rather than obtain their value, he was free to purchase them in the market.") But measuring damages as the higher of the value at breach or the value at some "reasonable" intermediate date following notice of breach, implicitly takes into account Plaintiff's duty to mitigate,[12] without requiring that the plaintiff take on additional financial risk in the hopes of avoiding some loss. In addition, here, unlike in *Schultz,* Lucente did not contract to purchase securities from Defendant. Rather, he was awarded the securities in consideration for his years of service to the company and with the expectation that he would remain loyal to the company (a company that eventually fired him). And while it is true that the securities underlying these grants—IBM common stock—were available on the open market, Lucente was not engaged in the business of investment speculation when he signed the options grants and the restricted stock agreement. Indeed, as an IBM insider, he could not trade. It would

be manifestly unjust to require one who has not speculated in the market to then go out and risk large sums of his own money on the grounds that he had a duty to mitigate.

IBM cites a number of cases for the proposition that, even where the underlying asset is a stock option award, courts have measured plaintiffs' damages in reference to their value at the time of breach. However, the facts of all the cases by IBM are clearly distinguishable from those here. In all those cases, the date of the breach was the date on which the plaintiff attempted to exercise options that were already "in the money," only to be notified that defendant would not honor the options awards. For example, in *Ertugrul v. Octel Communications Corp.,* No. C–95–20639, 1996 WL 207773, *1 (N.D.Cal. Apr. 19, 1996), plaintiff attempted to exercise his stock options three years after his termination from defendant, at which time defendant blocked him from exercising the options based on a dispute over the date the options were to vest. The date of breach was determined to be the date of plaintiff's attempt to exercise the options, since but for defendants's breach he would have gotten the difference between the strike price and the market price on that day—a day on which the options were, of course, "in the money." The court simply measured the damages as the difference between the exercise price and the value of the underlying shares on the date of breach. *Id.* at *5. Likewise, in *Hermanowski v. Acton Corp.,* 729 F.2d 921 (2d. Cir.1984) (per curiam), the court simply set the damages as the date of breach the date

---

instructions to sell at a later date); *In re Schuyler, Chadwick & Burnham,* 63 F.2d 241, 242 (2d Cir.1933) (wrongful hypothecation of stock); *Rivinus v. Langford,* 75 F. 959, 961 (2d Cir.1896) (conversion of a judgment whose value fluctuated according to a debtor's changing financial status); *In re Swift,* 114 F. 947, 949 (D.Mass.1902) (broker's breach of contract to deliver stocks on demand).

12. The general rule of law in a breach of contract case is that the plaintiff should not be compensated for any loss that he or she could have avoided upon learning that defendant had breached. *See Air et Chaleur, S.A. v. Janeway,* 757 F.2d 489, 494 (2d Cir.1985) ("New York's courts adhere to the universally accepted principle that a harmed plaintiff must mitigate damages."); 2 E. Allan Farnsworth, *Farnsworth on Contracts,* § 12.12, at 226 (2d ed.1998).

on which plaintiff attempted to exercise 5,000 shares of his stock option award at a time when the underlying shares were trading at a value almost ten time the exercise price. It ordered damages to be measured as the difference between the exercise price and the value of shares on the date of breach.[13]

Of course, not one of the cases cited by either party—nor any that the Court unearthed on its own—involved the facts here: The breach of a contract to award stocks that were not yet released from escrow and/or of options that were "under water." It is this unique fact pattern that complicates the selection of a damages methodology here.

## C. *Award of Damages*

### (1) *Restricted Stock*

■ Applying the case law to these facts, I conclude that it would be manifestly unreasonable to set as the valuation of Lucente's restricted stock the value of the stock on April 15, 1993. The shares were not out of escrow at that time, and, even absent IBM's breach, Lucente could not have sold them then. Under the terms of his original restricted stock agreement, Lucente would not have been entitled to take possession of the restricted shares until January 3, 2000. However, in September 1993, the IBM Board approved an acceleration of release from escrow all restricted stock awards made to IBM executives pursuant to the 1989 Long–Term Variable Plan and the Variable Compensation Plan. Under the terms of the acceleration, all restricted stock issued prior to 1993 become payable to the plan participant on the earlier of the date set forth in the applicable agreement or the date one

year from the date of retirement. (*See* Approval of Modification of Restrictions on Restricted Stock Awards, dated Sept. 28, 1993 (Bursor Decl. at Exh. 44).) For employees who had retired more than one year previously, the stock was released from escrow effective sometime after November 5, 1993, the date on which Lou Gerstner sent letters to all retired IBM executives who would be affected by the Board's approval of the acceleration plan. (Letter from L.V. Gerstner to E.F. Rogers dated Nov. 5, 1993 (Bursor Decl. at Exh. 45).)

Plaintiff disputes IBM's characterization of the acceleration, claiming that IBM has produced no evidence that this modification applied to former IBM executives who had been retired for more than two years at the time the modification was adopted. However, no such extrinsic evidence is required. It is clear on the face of the modification that the terms apply to "all awards of restricted stock made prior to 1993." (*Id.*) There is nothing limiting its application to any one type of employee or retiree. I therefore conclude that Lucente would have been entitled to the accelerated release date, which in his case would have been upon notification of the modification in or around November 1993.

■ It follows from both the conversion and breach of contract cases that, where the asset being contracted for is stock, the plaintiff's loss arises from the failure to deliver the shares, and thus from the gains he would made or loss he would have prevented by controlling the time to sell. *See* discussion at Sec. V.B.4, *infra.* Here, Lucente's right to trade the shares did not accrue until such time as IBM released the shares from escrow.

13. *See also Scully v. Wats,* Civ. A. 97–4051, 1999 WL 391495 (June 8, 1999 E.D.Pa.) (damages measured at time plaintiff attempted to exercise options but was repudiated by defendant); *Colorado Management Corp. v. American Founders Life Ins. Co.,* 148 Colo. 519, 367 P.2d 335, 337 (1961) (in action for refusal to deliver shares per stock option agreement on a date when the share price exceeded the exercise price, affirming trial court holding that measure of damages was market price at time of refusal to deliver); *Finnell v. Bromberg,* 79 Nev. 211, 381 P.2d 221, 227 (1963) (in action for breach of stock option agreement, damages measured on date optionee attempted to exercise his "in the money" options but was repudiated by grantor).

IBM's proposed measure of damages values Lucente's shares at a time when his benefit of the bargain had not yet accrued. On top of that, IBM seeks to further penalize Lucente for the fact that it had not accrued by discounting for lack of marketability. This does not give Lucente anything like the benefit of the bargain. Applying the *Galigher–Schultz* methodology, it is my conclusion that damages should be measured only after the date on which Lucente's shares were freely tradeable.

■ Another way to view the restricted stock agreement is to consider the accrued value of the shares during the escrow period as foreseeable consequential damages, under the venerable principles of *Hadley v. Baxendale*, 156 Eng.Rep. 145 (1845). IBM breached the agreement to award the shares and deliver them at the end of the escrow period. IBM also controlled the condition under which the shares had been awarded, i.e., the escrow arrangement. It was therefore reasonably foreseeable *to IBM* that the accrued value of the shares at the end of the escrow period was a natural consequence of its breach. And, where the loss is foreseeable by the party in breach, consequential damages may be awarded. *See* III Farnsworth on Contracts § 12.14 at 245. See also, *Charles E.S. McLeod, Inc. v. R.B. Hamilton Moving and Storage*, 89 A.D.2d 863, 864, 453 N.Y.S.2d 251, 253 (2d Dept. 1982) (damages recoverable are those "which at the time of the making of the contract the defendant had reason to foresee would be a natural and probable consequence of the breach.")

Under the *Galigher–Schultz* principles, or the law of consequential damages, I therefore hold that the measure of damages for breach of the restricted stock agreement must take into account the fact that, absent IBM's breach, he could not have sold the shares until early November 1993—the time at which Gerstner informed retired IBM executives of the acceleration of the pay-out dates on the stock awards. Lucente is entitled to the higher

of: (1) the value of the stock on the date his shares would have been released from escrow (measured as the date he would have received notice of their release from escrow); or (2) the highest intermediate value between the date of the release from escrow and the end of reasonable period thereafter.

Because the parties have not addressed this alternative measure of damages in their papers, the parties have thirty days from the date of this notice to provide the Court with proposed evidence of: (1) the actual date of notice of the accelerated release from escrow; and (2) objective measures (dates and time market was open, time required to execute an order, etc.) as to what would constitute a "reasonable period" within which Plaintiff could have sold his shares. To the degree that parties dispute any facts (not hypotheses or speculation as to what Plaintiff's actual trading history might have been), a jury will determine the proper award of damages under this measure.

### (2) *Damages for the Stock Options*

■ Valuing the breach of the options requires a different approach. Lucente could have exercised options at any time after they were awarded and before they expired. Thus, there was no date on which it was reasonably foreseeable that Lucente would have exercised the options.

The options-valuing models proposed by Defendant are forward-looking. That is, they attempt to place a value on a current asset (the option) taking into account the risk involved in future price fluctuations. Hindsight, of course, is 20/20 and the market value of IBM shares in the period following IBM's cancellation of the options in this case is a matter of record. It is for this reason that Plaintiff argues that the forward-looking pricing models fail to compensate him for the "benefit of his bargain." However, Plaintiff's proposed measure of damages requires the Court to accept as a factual assumption that Plaintiff would have exercised each and every

one of his options at the exact moment prior to the expiration dates when IBM stock traded at its highest value.[14] The statistical probability of this ever having happened, I would imagine, approaches zero. Only with the benefits of 20/20 hindsight could Plaintiff have hoped to fare so well. And the law does not entitle him to the benefit of hindsight.

Defendant's proposed measure of damages is also flawed. Defendant's valuation requires another unlikely assumption: that Plaintiff would have (or even could have) converted his interest in his options to a saleable commodity at a time when the options were still "under water." Of course, by their very nature, employee stock option awards are not saleable on the open market. Even if they were saleable, the likelihood that an employee—who has already agreed to accept compensation in the form of these incentive awards—would sell the option rights when the options were under water, rather than waiting and hoping that the options would go "in the money," is remote.

However, adoption of one of the net present value measures of the options appears to be the only sensible legal rule that ensures justice in all similar cases. It is manifest that Plaintiff would not have exercised the stock options while they were under water. But because that is true, it is also manifest that, had the value of the IBM shares continued to fall throughout the exercise periods for each of his options awards, Plaintiff would have realized no profit at all from them. Yet this Court would not find it appropriate to order him only nominal damages. Whether the stock rose dramatically in the years prior to the date Plaintiff brought suit or languished well below his exercise prices should have no effect on this Court measure of the damages.

I therefore decline Plaintiff's suggestion that damages be calculated under his theory. I will not, on this record, rule on Defendant's motion to exclude Plaintiff's expert Vaught, because Plaintiff may wish to call Mr. Vaught as an expert to offer his opinion on an appropriate net present value calculation of the options damages. I underscore, however, that Vaught's current report, premised as it is on a "hindsight"-based valuation, will not be admissible. Modern finance theory accepts several models for determining the net present value of an option grant, Black–Scholes and the binomial model are just two of them. While the differences in total valuation may, on these facts, result in only small differences of value, Plaintiff is entitled to present those differences as a question of fact to a jury. The parties are ordered to submit proposed expert testimony on this question to the Court within thirty days of this order.

This constitutes the decision and order of this Court.

---

14. IBM seems to make something of the fact that Lucente divested himself of all his other IBM shares in 1995. (Bursor Decl.Exh. 62 (Lucente 1996 tax return)). This fact, of course, is irrelevant to any determination of the measure of damages, which here is a pure question of law. It nonetheless underscores this Court's conclusion that the economic assumptions underlying Plaintiff's damages estimate is based on behavior that is unachievable in the real world, as belied by Plaintiff's own investing behavior.